2004 ME 154

**Paul BATES et al.**

v.

**DEPARTMENT OF BEHAVIORAL AND DEVELOPMENTAL SERVICES**[1] **et al.**

Supreme Judicial Court of Maine.

Argued: April 13, 2004.
Decided: Dec. 17, 2004.

does not affect the substantial rights of the parties.

1. As a result of enactment of P.L.2003, ch. 689, effective July 1, 2004, the Department of Behavioral and Developmental Services and the Department of Human Services have been merged into the Department of Health and Human Services. This opinion retains the former department names to maintain consistency with the departmental references used during the litigation.

Peter Darvin, Esq. (orally), Portland, Helen M. Bailey, Esq., Augusta, for plaintiffs.

G. Steven Rowe, Attorney General, Phyllis Gardiner, Asst. Atty. Gen. (orally), Katherine Greason, Asst. Atty. Gen., Augusta, for defendants.

Panel: CLIFFORD, RUDMAN, DANA, ALEXANDER, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] This matter is before the Court on the State's appeal of a judgment entered in the Superior Court (Kennebec County, *Mills, C.J.*) that (1) determined that the State was not in substantial compliance with a 1990 consent decree and incorporated settlement agreement; (2) found that the State had acted in bad faith in filing its notice of substantial compliance and in pursuing its efforts to achieve substantial compliance with the provisions of the settlement agreement; (3) held the State in contempt for its failure to have complied with the terms of the consent decree and settlement agreement by 2002; (4) appointed a receiver to supervise and direct the day-to-day operations of the Augusta Mental Health Institute (AMHI);[2] and (5) deferred for six months the question of

2. During the appeal, the principal building housing AMHI patients and services has been replaced by a new facility called the Riverview Psychiatric Center.

appointment of a receiver to supervise the Department of Behavioral and Developmental Services (BDS) with respect to the operation of community-based mental health programs and services.

[¶ 2] The State contends that the trial court (1) misinterpreted the consent decree in measuring substantial compliance by examining whether the State is meeting the needs of individual class members, rather than by generally examining overall progress toward compliance with the settlement agreement's goals and requirements; (2) improperly interpreted the consent decree and incorporated settlement agreement to require provision of services to all individuals in the community receiving or seeking mental health services, rather than just individuals who are present or former patients of AMHI; (3) erred in finding that the State had acted in bad faith in failing to achieve substantial compliance with the consent decree and settlement agreement, and consequently erred in finding the State in contempt; and (4) exceeded the bounds of its discretion and violated the separation of powers clause, Article III of the Maine Constitution, by appointing a receiver to operate AMHI and supervise the activities of BDS with respect to AMHI.

[¶ 3] We conclude that the court correctly determined that the State had failed to comply with the requirement that the State develop a comprehensive plan for implementation of the consent decree and settlement agreement, supported by detailed standards and an objective evaluation, quality assurance and reporting process to measure compliance with the requirements of the settlement agreement and that without such standards for evaluating programs and measuring compliance, it was not possible for the State to prevail in meeting its burden to prove substantial compliance. We also conclude

that the court erred in some of its legal conclusions, specifically: (1) in the absence of systemic evidence, the court erroneously relied on the extent to which the State provided for the needs of selected individual class members rather than the class as a whole in assessing whether the State achieved substantial compliance with the settlement agreement; (2) the court did not consider some evidence of recent remedial efforts by the State in reaching its contempt conclusions; and (3) the court exceeded the bounds of its discretion in appointing a receiver. Accordingly, we affirm portions and vacate portions of the judgment, and remand for further proceedings.

## I. CASE HISTORY

### A. The Consent Decree and Settlement Agreement

[¶ 4] In 1989, a group of patients filed an action against the State, including the then existing Department of Mental Health and Mental Retardation, later known as BDS, the Department of Human Services, and several named officials in those Departments. The action alleged that the State, in its care, supervision, and provision of treatment and services to present and former patients of AMHI, was acting in violation of constitutional and statutory requirements. The State was alleged to be violating the Fourteenth Amendment to the United States Constitution; Article 1, Sections 1 and 6–A of the Maine Constitution; 42 U.S.C.A. § 1983, and the 1989 versions of several Maine laws including 18–A M.R.S.A. § 5–601; and 34–B M.R.S.A. §§ 1430, 3003, 3004, 3803, 3871.

[¶ 5] Acting pursuant to M.R. Civ. P. 23(b)(2), the Superior Court (*Brody, C.J.*) certified as a class of plaintiffs "all persons who, on or after January 1, 1988, were patients at the Augusta Mental Health Institute ... and all persons who will be

admitted to AMHI in the future." The court also certified a subclass of plaintiffs consisting of "those persons who are class members and who also have been public wards of the Maine Department of Human Services or who in the future become public wards."

[¶ 6] On July 31, 1990, representatives of the parties entered into an extensive settlement agreement to resolve the pending litigation. On August 2, 1990, a six-page consent decree incorporating the settlement agreement by reference was approved by the Superior Court (*Chandler, J.*). The consent decree defines the plaintiff class as consisting "of all persons who on or after January 1, 1988 were patients at the Augusta Mental Health Institute and all persons who will be admitted to the Augusta Mental Health Institute in the future."

[¶ 7] The consent decree provides that the class would close, retroactive to the State's filing a notice of substantial compliance, upon the date when the court determined that the State was in substantial compliance with the consent decree. The consent decree states that the parties contemplated that substantial compliance would be achieved, subject to approval of the court, on or before September 1, 1995. It also provides that the court would retain jurisdiction over implementation of the consent decree and the settlement agreement until the provisions of the settlement agreement had been "fully and faithfully implemented," at which point the settlement agreement would be dissolved. The consent decree specifies the procedure for determining substantial compliance, with the State assigned the burden of proof of substantial compliance.

[¶ 8] The incorporated settlement agreement contains 303 numbered paragraphs, divided into nineteen sections. It defines the plaintiff class in the same limited manner as the consent decree. It states that its purpose is to assure "that conditions at AMHI and services provided to class members in the community will meet constitutional, statutory, and regulatory standards as applicable."

[¶ 9] The settlement agreement requires development of a comprehensive plan to meet the obligations of the agreement. The initial plan was to have been submitted to and approved by the court by January 1, 1991, only five months after approval of the consent decree. The settlement agreement addresses the details of the comprehensive plan in paragraphs 36–38 as follows:

36. The plan shall describe each component of the system, its costs and funding sources, timelines for development or implementation, and the means whereby its quality and effectiveness shall be monitored and evaluated on an ongoing basis. For each client service component of the system, the plan shall additionally: describe the models to be used and the capacity of the services both in terms of numbers of individuals to be served and the intensity of services delivered; demonstrate that development plans are based upon class members' actual needs for the planned services, and enclose supporting data.

37. The plan shall verify with supporting data that in meeting class members' identified needs, defendants shall not deprive non-class members of services solely because they are not members of the class.

38. Defendants shall comply with the performance terms and schedule of the plan. The plan may be revised with the master's approval. Defendants must seek revision of the plan as needed to assure that services are developed based upon class members' actual needs.

[¶ 10] To provide an objective basis to measure compliance with the settlement agreement and progress in achieving the goals of the comprehensive plan, the State was required to develop a system for monitoring, evaluation and quality assurance. Paragraph 279 of the settlement agreement states that:

By September 1, 1991, Defendants shall design a comprehensive system of internal monitoring, evaluation and quality assurance for all areas covered by this Agreement. Critical data shall be collected and reported through an electronic data base system. As part of this system, defendants shall perform an annual random statistically significant review of class members residing both at AMHI and in the community to measure defendants' compliance with this Agreement in meeting individual class members' needs and in protecting their rights under this Agreement.

[¶ 11] Separately, the court master, in consultation with the Plaintiffs and the State, was directed to "develop a process to evaluate and measure the Defendants' compliance with the terms and principles of this Agreement."

[¶ 12] Beyond the generalized goals envisioned for the comprehensive plan, the settlement agreement includes extensive details addressing all aspects of inpatient and community-based care, supervision, treatment, housing, and support for class members.

[¶ 13] Fifteen paragraphs address (1) creation of a statement of client rights; (2) grievance and complaint procedures; and (3) reporting and monitoring compliance with the described rights and procedures.

[¶ 14] Thirty-four paragraphs address development of individualized support plans (ISPs) for each class member to assure that class members receive services to meet their individual needs at AMHI, in

community hospitals, and in the community at large. The settlement agreement indicates that services planned for class members in ISPs "shall be based on the actual needs of the class member rather than on what services are currently available." An interim ISP was to be developed when a particular service was not immediately available.

[¶ 15] Twenty-eight paragraphs address use of and access to community-based resources to serve class members' needs in areas of hospitalization, housing, residential support services, crisis intervention, vocational opportunities and training, treatment services, transportation, family support, and recreational, social and avocational opportunities.

[¶ 16] Twenty-one paragraphs address standards to be required for agencies providing mental health services to class members in the community.

[¶ 17] Ninety paragraphs address standards to govern all aspects of AMHI operations including the physical environment, medications, use of restraints, staff hiring, direction, training, pay, and retention. This section includes specific staff-patient ratios, to be achieved by 1992, for most categories of staff involved with treatment of patients, and requirements for prompt admission and discharge of patients as they qualify for admission or discharge.

[¶ 18] Other provisions of the settlement agreement provide goals and direction for treatment of minors, nursing home patients, and patients on the AMHI forensic unit, and address the Department of Human Services' responsibility for public wards and adult protective services. The concluding paragraphs of the settlement agreement address its implementation, including the State's responsibility to plan and seek resources to implement the consent decree and the settlement agreement,

the appointment of a court master, and enforcement of the provisions in the settlement agreement.

## B. Post Consent Decree Actions

[¶ 19] Shortly after the consent decree was approved, Maine entered a prolonged period of fiscal crisis that required the executive and the legislative branches to institute difficult reductions in many State programs, including programs serving individuals with mental illness. In 1994, when the State was still experiencing fiscal shortfalls, the plaintiffs filed a motion for contempt and enforcement of the consent decree. After a five-day hearing, the trial court (*Chandler, J.*) essentially ruled against the State. The court predicated its ruling on a statement of its view of the purposes of the consent decree and settlement agreement, set forth as follows:

1. To establish in Maine, or more specifically with regard to this Decree, the Augusta Mental Health Institute catchment area, a system for delivery of services to the mentally ill which would be community based in all regards and which would result in the eventual elimination or at least radical downsizing of the Augusta Mental Health Institute and would provide an array of community based services for all people with mental illness but specifically for those people with serious and persistent mental illness such as would have resulted in their hospitalization at AMHI.

2. To deliver services to people with mental illness on an individualized basis with a recognition of individual needs and deliver it in a manner consistent with respect for the individual and aimed towards establishing in so far as possible self respect and self reliance and participation in decisions concerning treatment and other services provided.

The court stated that it would interpret the consent decree in light of this view of the purposes of the consent decree.

[¶ 20] In its opinion, referencing the fiscal crisis from which the State was only then beginning to emerge, the court noted, correctly, that "financial impossibility due to failure of legislative appropriations is, in fact, an 'impossibility' which would be a defense" to a motion to find the State in contempt. However, the court stated that "funding was not the problem. Lack of concerted effort directed toward compliance with the Decree is the problem." The court was critical of the State, finding it had "used the financial difficulties to excuse noncompliance" with aspects of the settlement agreement that, the court asserted, "were not financially driven."

[¶ 21] The State attempted to justify reduced commitments to serve the needs of class members by arguing that it did not want to create two levels of mental health treatment, one for class members and one for individuals needing treatment for mental illness who were not class members. Addressing this argument, the court stated:

The defendants' stated objective of not creating a two-tiered system is laudable, but is acceptable only if the needs of all receivers of mental health services are met in compliance with the Settlement Agreement and Consent Decree. If equality is achieved only by failing to meet the court mandated levels of service for the class members, the equality is neither acceptable nor legally justifiable.

Furthermore, if budgetary constraints or any other factors cause a need for change in the Decree, the defendants cannot simply make those changes based on their idea of what is necessary. It is not enough that the plaintiffs may have from time to time agreed to changes. If

changes are to be made and these changes result in different deadlines, different goals, different approaches than the Decree envisions, a formal change in the court ordered process must be applied for.

[¶ 22] The court found the State in contempt[3] in the following areas: (1) failing to properly plan for the downsizing of AMHI and a commensurate increase in community-based facilities; (2) failing to properly plan for and hire staff to support delivery of services to class members on an individualized basis; (3) failing to properly plan to meet the housing and residential needs of class members; (4) proceeding with plans and programs without prior approval of the court master; (5) instituting major changes in funding methods to the detriment of the class members without consultation with or prior approval of the court; (6) failing to meet deadlines for approval of plans and programs without seeking court approval for deadline extensions; (7) failing to institute a coordinated system for monitoring and evaluating progress toward substantial compliance; and (8) failing to recognize that class members "are a distinct class governed by the Settlement Agreement whose needs must be given priority when funding levels mandate that services be prioritized."

[¶ 23] The Court ordered the State to come into compliance by achieving certain objectives by certain dates, and specifically instructed the State on how to come into compliance. For example, the State was ordered to submit all outstanding plans required by the consent decree to the court master by December 1, 1994. If the master did not approve the plans, the master was to hire an outside consultant to assist with bringing the proposed plans into compliance.

[¶ 24] In August 1995, plaintiffs filed a motion for imposition of sanctions and for contempt of the consent decree and the September 1994 order. After a five-day hearing, by order dated March 8, 1996, the Superior Court (*Mills, J.*) determined that the State was in contempt of the 1994 order, and proposed to appoint a receiver "to take over from the defendants all responsibility for compliance with the terms of the Settlement Agreement, the Consent Decree and the order dated 9/7/94."[4] The trial court then stayed appointment of the receiver to give the State a final opportunity to comply with specific instructions by specific dates.

[¶ 25] From 1996 to January 2002, the parties filed various plans for compliance and reports with the court master, and the court master reported to the court. The State did not file a notice of substantial compliance during that time, nor did the State file any motions to amend the consent decree and settlement agreement or to extend its time limits. The plaintiffs filed no additional motions for contempt.

[¶ 26] In March 2001, the State informed the court that it intended to file a notice of substantial compliance by the end of that year. When no notice was filed by January 15, 2002, the court, on its own initiative, moved to determine whether the State was in substantial compliance with the consent decree as of that date. Thereafter, on January 25, 2002, the State filed a

---

3. The court declined to hold the Governor personally in contempt as plaintiffs had urged. The court determined that the Governor was not bound by the terms of the consent decree.

4. The court found the State in contempt for failure to meet the requirements of the 1994 order regarding planning to achieve compliance, assessment of the needs of individual class members, and discharge of class members residing at AMHI for more than 150 days, other than forensic patients.

"Notice of Substantial Compliance" pursuant to the consent decree, claiming to "have attained substantial compliance with all requirements of the Settlement Agreement that is incorporated into the Decree." Plaintiffs filed objections and supporting factual material addressing most of the paragraphs of the settlement agreement.

[¶ 27] Prior to hearing, the parties filed a motion requesting that the court state how it would define the term "substantial compliance." The trial court stated in an "Order on Definition of Substantial Compliance" that various provisions of the settlement agreement appear to require different standards of compliance, with some paragraphs requiring reasonable efforts, and others containing specific numerical standards for compliance. The trial court therefore declined to define substantial compliance before the evidentiary hearing. Instead, it enumerated factors that it would consider when evaluating the evidence to determine whether substantial compliance had been attained. Those were:

1. the overall goals of the Consent Decree and the Settlement Agreement;

2. the language of the Consent Decree and Settlement Agreement;

3. specific numerical standards and dates in the Consent Decree and Settlement Agreement;

4. the nature of the interests involved and the consequences of noncompliance;

5. the history of this case; and

6. the procedural posture of the case at the time of the hearing.

C. The Trial and Decision (Part I Order)

[¶ 28] After a seventeen-day trial on whether the State had substantially complied with the settlement agreement, the trial court issued an extensive and carefully considered order stating its findings and conclusions. It found that the State had met its burden of proving substantial compliance with only twenty-three of the 197 paragraphs of the settlement agreement that were at issue.[5] Citing "the flaws in defendants' proof," the court noted that "the defendants were required to present evidence that proved compliance as of 1/25/02. Instead, the defendants presented, in large part, evidence about expected procedure and about events that occurred after 1/25/02."

[¶ 29] Other important rulings contained in the Part I Order are that (1) "defendants have developed a system that relegates non-class members with mental illness to second-class status.... Such a two-tiered system has not achieved substantial compliance by any standard; that system has failed"; (2) forensic patients are merely warehoused at AMHI without treatment and discharge plans; (3) despite commitments in the settlement agreement to the contrary, patients who need hospitalization at AMHI are refused admission because it does not have the staff or beds to accept patients, and patients who are ready for discharge remain at AMHI because the workers and resources needed to support their living in the community are not available; (4) people who live in the community are not getting the services they need because the State has not identified their needs or developed resources to meet the needs; (5) crisis intervention services are inadequate; and (6) the State was not in substantial compliance with the agreement to develop a comprehensive plan for provision of mental health services. The court also determined that the

5. Substantial compliance was not disputed, or was not an issue, with the remaining 106 paragraphs of the settlement agreement.

State did not meet its burden of showing that all necessary steps and good faith efforts had been taken to obtain adequate funding through the 2003 budget process for fiscal years 2004 and 2005.

[¶ 30] The trial court found that the State had produced volumes of data but had not established evaluation standards or reporting processes by which performance could be measured, as required by the settlement agreement. The trial court further found that "[t]his is not a failure of funding. The evidence made clear that until recent budgetary problems, money for Consent Decree purposes was consistently provided by the Legislature. This is a failure of management to get the job done."

[¶ 31] This finding was based in part on testimony of the then Commissioner of BDS and of the Superintendent of AMHI that indicated a significant lack of attention to and familiarity with the requirements of the consent decree. For example, in its findings, the trial court noted that the AMHI Superintendent "initially testified that she had gone through the Consent Decree [6] paragraph by paragraph, collected data, and made an assessment. Later, she admitted that the first time she had reviewed the Consent Decree to determine the standards relied on for compliance was during the trial." The court stated that the AMHI Superintendent

> had no benchmark for many of the requirements. If an area was not covered by DHS and JCAHO [7] regulations, she used her professional judgment. If something specified 100%, her standard was 100%. She did not know which paragraphs of the Consent Decree require 100% compliance; she expected

that other people would know. The JCAHO determination of "substantial compliance" requires a score of 85% or more and she would like AMHI to be better than that.

[¶ 32] Addressing the individual sections of the consent decree and settlement agreement, the court found that the State failed to achieve substantial compliance with most of the goals and requirements established by the consent decree and settlement agreement.

[¶ 33] At several points in its opinion, the court emphasized its interpretation of the settlement agreement as requiring the State to create and maintain a system of mental health services that would meet the actual needs of all class members. The court stated: "Clearly the defendants have failed to show that a mental health system is in place and is meeting the needs of all class members who want services." Later the court stated:

> The concept of meeting a person's needs pervades the Consent Decree. The Department was required to go beyond the consideration of whether there was a resource available and address the fundamental question of whether the person's need is actually being met. An ISP is a tool to meet people's needs, but if the need is not in the ISP, it has to be addressed outside of the ISP.

[¶ 34] Thus, the standard for substantial compliance set by the trial court and urged by the plaintiffs appears to be the creation and maintenance of a mental health system that meets the individual needs of all persons with mental illness.

6. In its opinion, the trial court indicated that its references to the consent decree included the settlement agreement.

7. JCAHO is an abbreviation for the Joint Commission on the Accreditation of Healthcare Organizations, a group involved with accreditation of mental health facilities.

D. The Remedy for Noncompliance (Part II Order)

[¶ 35] After making its findings, the court deferred consideration of its conclusions and the remedies it would order. These were addressed in Part II of its Order. In Part II, the trial court determined that the State was in contempt of the consent decree and had acted in bad faith in filing the notice of substantial compliance. In reaching this result, the court noted particularly the testimony of the Commissioner of BDS and of the Superintendent of AMHI, which the court found not credible on some points and, in several areas, insufficiently attentive to an understanding of the terms of the consent decree and settlement agreement.

[¶ 36] The court appointed a receiver to operate AMHI and indicated that it would consider appointing a receiver to operate the community mental health system. The receiver for AMHI was given all powers and authority usually vested in the Superintendent as they relate to the duties and obligations under the consent decree. Those powers include, among other things, authority to oversee all financial, contractual, legal, administrative, and personnel functions at AMHI and to restructure AMHI into an organization that will achieve compliance; to retain consultants, experts, or others to provide training to the AMHI staff or to assist in achieving compliance; to negotiate new contracts, including contracts with labor unions; to restructure management; and establish the budget. The receiver is required to report to the court on a monthly basis and to prepare a work plan for submission to the court on how compliance will be achieved.

[¶ 37] The appointment of a receiver over the community mental health system was stayed for six months to give the State further opportunity to make progress to-wards compliance. After a motion for stay of the appointment of the AMHI receiver was denied, the State brought this appeal.

## II. STANDARD OF REVIEW

[¶ 38] A trial court's fact-findings are reviewed for clear error. *In re Heather G.*, 2002 ME 151, ¶ 12, 805 A.2d 249, 252. Judgmental decisions evaluating remedies in areas where the court has choices will be reviewed for sustainable exercise of the court's discretion. *See Dep't of Envtl. Prot. v. Emerson*, 563 A.2d 762, 767–68 (Me.1989) (reviewing appointment of receiver, issuance of attachment, and grant of mandatory injunctive relief); *see also Town of Charleston v. Sch. Admin. Dist. No. 68*, 2002 ME 95, ¶ 6, 798 A.2d 1102, 1104 (reviewing grant of temporary restraining order). The trial court's interpretation of its own judgment will be reviewed de novo on questions of law and deferentially for a sustainable exercise of discretion on matters of choice. *State v. Forbis*, 2004 ME 110, ¶ 7, 856 A.2d 621, 623; *Thompson v. Rothman*, 2002 ME 39, ¶¶ 6–8, 791 A.2d 921, 923–24. Rulings of law will be reviewed de novo. *Blanchard v. Sawyer*, 2001 ME 18, ¶ 5, 769 A.2d 841, 843.

[¶ 39] The court's findings and decision-making regarding contempt are reviewed by the same standards, but subject to the clear and convincing evidence burden of proof. M.R. Civ. P. 66(d)(2)(D); *Pratt v. Spaulding*, 2003 ME 56, ¶¶ 10–11, 822 A.2d 1183, 1186–87.

## III. LEGAL ANALYSIS

A. The State's Legal Obligations and the Consent Decree

[¶ 40] After thorough deliberation, the trial court made extensive findings of historical facts and events incident to the State's efforts to achieve compliance with

the consent decree. At some places it explicitly stated that it did not find some or all of the testimony of some of the State's witnesses to be credible. *See In re Heather G.*, 2002 ME 151, ¶ 9, 805 A.2d at 251. The court's findings regarding historical facts and events are supported by the record. The closer issues in this case involve application of the law to the facts and the conclusions that the court reached as a result of the application of its view of the law to the facts. We turn now to those questions, which we review de novo or for a sustainable exercise of discretion.

[¶ 41] The central issues in this case revolve around (1) the proper interpretation of the consent decree and the incorporated settlement agreement; (2) how substantial compliance with the settlement agreement is to be measured; (3) the extent to which the consent decree and the settlement agreement require the State to provide a comprehensive, community-based, mental health care and treatment system for individuals with mental illness who are not members of the plaintiff class; and (4) the extent of the court's authority to enforce remedies through appointment of a receiver. In our review, we initially examine (1) the applicable constitutional and statutory standards; (2) the Americans with Disabilities Act; and (3) the expansion of state Medicaid and insurance programs to serve individuals with mental illness.

### 1. Applicable Constitutional and Statutory Standards

[¶ 42] The stated purpose of the settlement agreement is to assure that treatment of class members—the present and former patients of AMHI—"will meet appropriate constitutional, statutory and regulatory standards" for care and treatment of persons with mental illness in state mental health facilities. Therefore, in reviewing the trial court's interpretation of key terms in the consent decree and the settlement agreement, it is necessary to look first to the governing constitutional, statutory, and regulatory standards for treatment of individuals committed to state mental health facilities.

[¶ 43] At the time the consent decree and settlement agreement were adopted, the State's constitutional obligation to provide services or treatment to individuals with mental illness, or any other illness, had been summarized by the United States Supreme Court as follows: "As a general matter, a State is under no constitutional duty to provide substantive services for those within its border." *Youngberg v. Romeo*, 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (citing *Harris v. McRae*, 448 U.S. 297, 318, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (publicly funded abortions)); *Maher v. Roe*, 432 U.S. 464, 469, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (medical treatment). Only when a person is institutionalized and dependent on the State do certain duties of the State to provide services arise. *Youngberg*, 457 U.S. at 317, 102 S.Ct. 2452. For institutionalized persons, the United States Supreme Court has recognized substantive, constitutional rights to receive adequate food, shelter, clothing, medical care, safety, freedom of movement, and, under certain circumstances, minimally adequate training. *Id.* at 315–19, 102 S.Ct. 2452; *see also DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 198–99, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

[¶ 44] Several jurisdictions have recognized a right to treatment in the least restrictive environment. *See Spencer v. Lee*, 864 F.2d 1376, 1392 (7th Cir.1989); *Halderman v. Pennhurst State Sch. & Hosp.*, 446 F.Supp. 1295, 1319 (E.D.Pa. 1977), *substantially aff'd*, 612 F.2d 84 (3d

Cir.1979), *rev'd and remanded on other grounds*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Welsch v. Likins*, 550 F.2d 1122, 1125 (8th Cir.1977).

■ [¶ 45] No opinion of the United States Supreme Court has broadened these basic constitutional rights to treatment for individuals with mental illness since adoption of the consent decree and settlement agreement. Accordingly, when a state subjects a person to custody, institutionalization, or other restraint, it assumes special obligations—obligations that are constitutional—to provide for that person's care, support, and humane treatment in a least restrictive setting. The fact that individuals subject to custody, institutionalization, or other restraint receive special services, paid for by the State, creates no constitutional obligation for the State to provide and pay for similar services to the general population or some non-institutionalized segment of the general population.

[¶ 46] Maine statutes in effect at the time the complaint was filed formed a basis for the plaintiffs' assertion of broader substantive rights than those protected by the United States Constitution. The statutes relied on by the plaintiffs' class included 34–B M.R.S.A. § 1430 (1988), which provided:

> Any resident of a state institution has a right to nutritious food in adequate quantities, adequate professional medical care, an acceptable level of sanitation, ventilation and light, a reasonable amount of space per person in any sleeping area, a reasonable opportunity for physical exercise and recreational activities, protection against any physical or psychological abuse and a reasonably secure area for the maintenance of permitted personal effects.

[¶ 47] Additionally, legislation required the Director of the then Bureau of Mental Health to promulgate rules to establish rights to (1) treatment and related services in the least restrictive appropriate setting; (2) an individualized treatment plan to be developed with participation of the client; (3) informed consent to treatment; (4) appropriate privacy and a humane treatment environment; (5) confidentiality of records; (6) have visitors and to communicate by telephone and mail; (7) procedures for notice pertaining to rights; (8) a service system that employs culturally normative and valued methods and settings; (9) individualized developmental programming that recognizes that each long-term mentally ill individual is capable of improvement; (10) a continuum of community services; and (11) maintenance of relationships with family and friends. 34–B M.R.S.A. § 3003(2) (1988).

[¶ 48] The plaintiffs also asserted rights under 34–B M.R.S.A. § 3004 (1988), which required the Bureau to establish an Office of Community Support Systems, meaning an "entire complex of mental health, rehabilitative, residential, and other support services in the community to ensure community integration and the maintenance of a decent quality of life for persons with chronic mental illness."

[¶ 49] Other statutes in effect at the time recognized institutionalized patients' rights to exercise their civil rights, to humane care and treatment, to be free of restraints and from seclusion except under defined circumstances, to communicate privately with others, to have visitors, and to not be sterilized. 34–B M.R.S.A. § 3803 (1988). The staffs of mental health hospitals were required to periodically examine patients to assess mental conditions and to discharge patients for whom the conditions justifying hospitalization no longer existed. 34–B M.R.S.A. § 3871 (1988).

[¶ 50] Thus, at the time the settlement agreement was adopted, many of its provi-

sions tracked very closely the constitutional requirements stated above and the additional statutory rights and obligations created by the Maine Legislature. Notably in this case, the plaintiffs agree that the State is in substantial compliance with those provisions of the settlement agreement directed to avoidance of patient abuse, neglect, or exploitation. These concerns which, in the past, have triggered judicial regulation of institutions, are not at issue here. *See Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 7, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

[¶ 51] The constitutional and statutory obligations discussed above and the terms of the consent decree and settlement agreement have been the focus of the trial court and the parties in this litigation. However, our review of the parties' arguments and the trial court's legal conclusions and the remedies it adopted must also consider some other statutory developments subsequent to the adoption of the consent decree, including one significant development subsequent to the trial in this matter.

### 2. The Americans with Disabilities Act

[¶ 52] The week prior to adoption of the settlement agreement and approval of the consent decree, on July 26, 1990, the Americans with Disabilities Act (ADA) was enacted, Pub.L. No. 101–336, §§ 1–514, 104 Stat. 327–78 (1990), *codified at* 42 U.S.C.A § 12101–213 (1995 & Supp.2004). The key provision of this law, relating to public agencies, is 42 U.S.C.A. § 12132 (1995), which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

[¶ 53] In light of the coincident timing of these actions, it is apparent that the provisions of the ADA could not have been considered in the drafting and approval of the consent decree and settlement agreement. The effective date of the ADA was set for eighteen months following enactment. P.L. 101–336, § 205, 104 Stat. 338.

[¶ 54] Although the ADA was intended to make dramatic changes in the rights of individuals with disabilities, including mental illness, and in the obligation of states and local governments toward such individuals, the record indicates that ADA considerations have not significantly affected the parties' positions in implementing and litigating compliance with the settlement agreement. This focus on the terms of the settlement agreement continued even after a 1999 opinion of the United States Supreme Court extensively considered the ADA and addressed a state's obligation toward individuals with mental illness who are institutionalized and who may qualify for subsequent release to community treatment programs. *Olmstead v. L.C.,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999).

[¶ 55] Writing for the Court, Justice Ginsburg introduced the issue and holding in *Olmstead* as follows:

This case concerns the proper construction of the anti-discrimination provision contained in the public services portion (Title II) of the Americans with Disabilities Act of 1990(ADA), 104 Stat. 337, 42 U.S.C. § 12132. Specifically, we confront the question whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions. The answer, we hold, is a qualified yes. Such action is in order when the State's treatment professionals have determined that community placement is appropriate, the

transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities .... We remand the case, however, for further consideration of the appropriate relief, given the range of facilities the State maintains for the care and treatment of persons with diverse mental disabilities, and its obligation to administer services with an even hand.

*Olmstead,* 527 U.S. at 587, 119 S.Ct. 2176.

[¶ 56] In reaching this result, the Court emphasized that the issues were decided as a matter of ADA interpretation and that the case "presents no constitutional question." *Id.* at 588, 119 S.Ct. 2176.

[¶ 57] *Olmstead* involved claims under the ADA by individuals with mental illness who asserted that they were discriminated against because they remained confined to institutions after state treatment professionals had determined that community-based treatment would be appropriate for each individual, and such community-based treatment was provided to other qualifying individuals with mental illness. *Id.* at 593–94. The state had objected that the additional expenditures required to provide community-based treatment to such individuals was unreasonable under the ADA, given other demands on the state mental health budget. *Id.* at 594, 119 S.Ct. 2176.

[¶ 58] The Supreme Court's opinion stated that the Court of Appeals had construed the ADA, and its implementing regulations, to allow a cost-based defense only in limited circumstances, when it was determined that the additional expenditures

necessary to treat the individual plaintiffs in community-based settings would place unreasonable demands on the state's mental health budget. *Id.* at 603, 119 S.Ct. 2176. Four Justices of the Supreme Court held that the Court of Appeals' construction of the ADA regulations to require that reasonableness of costs of compliance be determined by looking to the expense of providing treatment to each individual plaintiff was "unacceptable for it would leave the state virtually defenseless once it is shown that the plaintiff is qualified for the service or program she seeks." *Id.*[8] Instead, the Justices wrote that the ADA reasonable-modification regulations, "[s]ensibly construed, ... would allow the state to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the state has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." *Id.* at 604, 119 S.Ct. 2176.

[¶ 59] In sum, the ADA has been construed to require that:

■ (a) Community-based treatment programs be administered, supported, and made available "with an even hand" to qualifying individuals with mental illness without discrimination for or against individuals in institutional treatment. *Id.* at 587, 603 n. 14, 607, 119 S.Ct. 2176.

■ (b) The reasonableness of a state's commitment of resources must not be judged strictly on its response to the needs of any individual plaintiff or client. Instead the states are obligated to accommodate plaintiff's needs "taking into account the resources available to the State and the needs of others with mental disabili-

---

8.  Three other justices dissented, writing that the ADA was not violated by the state practices at issue. *Olmstead v. L.C.,* 527 U.S. 581, 615–26, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (Thomas, J., dissenting).

ties." *Id.* at 607, 119 S.Ct. 2176. *See also id.* at 603–05, 119 S.Ct. 2176.

■ (c) While the ADA does not impose on the states a "standard of care" for whatever medical services a state provides, or require that the states provide a certain level of benefits to individuals with disabilities, the states "must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Id.* at 603 n. 14, 119 S.Ct. 2176.

[¶ 60] The State's programs to address needs of individuals with mental illness, whether class members or not, and whether covered by the settlement agreement or not, must include recognition of these requirements of federal law.

    3.   Expansion of State Medicaid and Insurance Programs to Serve Individuals with Mental Illness

[¶ 61] After the trial court's May decision on the facts, but prior to its September decision on the remedy, the Maine Legislature enacted a substantial expansion of eligibility for the State Medicaid program and a new health insurance program to cover, among others, persons diagnosed with "psychotic disorders." P.L. 2003, ch. 469. "An Act to Provide Affordable Health Insurance to Small Business and Individuals and to Control Health Care Costs." Among many other provisions, this legislation: (1) amended 22 M.R.S.A. § 3174–G(1)(C), (F) to significantly expand the number of individuals who may qualify for Medicaid, including assistance for treatment of mental illness; and (2) created a new health insurance program called "Dirigo Health," that is designed to expand health insurance coverage and includes adoption of 24–A M.R.S.A. § 6971, establishing a high-risk pool to assure private or state-paid coverage for treatment of many difficult condi-

tions including "psychotic disorders," *id.* § 6971(1)(B).

[¶ 62] This significant expansion of resources available for treatment of illnesses generally, and mental illness in particular, cannot be ignored in evaluating the good faith and seriousness of the State of Maine's commitment to provide and improve institutionalized and community-based treatment for individuals with mental illness.

[¶ 63] With this background of the current state of the law impacting the contested issues in this litigation, we turn to review of those issues as decided by the trial court.

    B.   Review of Contested Issues

    1.   Application of the Consent Decree to Non–Class Members

[¶ 64] Much of the focus of the litigation over the past decade has addressed the adequacy of the State's commitment of effort and resources to provide the same care and treatment systems for non-class members that the consent decree and settlement agreement require for class members. The class of persons covered in this action is narrow. It comprises patients at AMHI from January 1, 1988, forward to whatever date substantial compliance with the consent decree is achieved.

[¶ 65] Only two paragraphs of the 303–paragraph settlement agreement refer to non-class member consumers of mental health services. Subparagraph 32(g) is in a section listing many principles governing administration of a comprehensive mental health system "to meet class members' needs." It provides, "[n]on-class members shall not be deprived of services solely because they are not members of the plaintiff class." Paragraph 37 requires that the comprehensive plan "verify with supporting data that in meeting class

members' identified needs, defendants shall not deprive non-class members of services solely because they are not members of the class." Neither of these provisions is a specific mandate. Both are stated as among the overall principles governing planning and development of a comprehensive mental health system.

[¶ 66] The trial court concluded with respect to these paragraphs:

> The overwhelming evidence in this case shows that the defendants have developed a system that relegates non-class members with mental illness to second-class status. Non-class members are placed on waiting lists for services while class members are moved automatically to the top of that list. This does not mean that class members are receiving the services they need, but it does mean that non-class members are receiving significantly fewer services than class members. Such a two-tiered system has not achieved substantial compliance by any standard; that system has failed.

[¶ 67] Considered only in the context of the settlement agreement, which explicitly limited its coverage to class members, it might be difficult to argue that an agreement between department heads and clients of those departments could unilaterally, and without legislative authorization, create such a broad-based community mental health program. However, the settlement agreement must be reasonably construed to accord with the Americans with Disabilities Act. The settlement agreement commits the State to provide broad-based, community-oriented treatment programs for class members. When the State provides such programs, the ADA, as interpreted in *Olmstead*, requires that those programs be available, without discrimination, to class members and other individuals in the community qualifying for such services who are entitled to reasonable accommodation pursuant to the ADA. *Olmstead*, 527 U.S. at 587, 603 n. 14, 607.

[¶ 68] Accordingly, our interpretation of the settlement agreement, consistent with the ADA, supports the plaintiffs' arguments and the trial court's determination that compliance with the settlement agreement requires the State to provide the same community mental health services to qualifying non-class members as are required for class members.

2. Substantial Compliance Standards

[¶ 69] Whether substantial compliance with a consent decree has been achieved depends on the nature of the interest at stake and the degree to which noncompliance affects that interest. *Fortin v. Comm'r of the Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 795 (1st Cir.1982). "[N]o particular percentage of compliance can be a safe-harbor figure, transferable from one context to another. Like 'reasonableness,' ... 'substantiality' must depend on the circumstances of each case." *Id.* Factors to be considered are the language of the consent decree, the circumstances under which the parties agreed to be bound by its terms, and its purpose. *See Rolland v. Cellucci*, 138 F.Supp.2d 110, 115 (D.Mass.2001). The meaning of substantial compliance depends on the paragraph of the consent decree alleged to have been violated. *Id.* Paragraphs containing objective, numerical standards may be more strictly enforced. *Id.* at 118.

[¶ 70] Here, the parties and the trial court appear to agree that substantial compliance, even with standards that can be objectively measured, cannot be assessed by using any particular number.[9]

---

9. In its order addressing the definition of sub-    stantial compliance, the trial court indicated

The real difficulties arise not in numbers but in criteria for measurement of compliance.

[¶ 71] The trial court assessed whether the State had achieved substantial compliance "with respect to individual class members and not the class as a whole." For many of the provisions of the settlement agreement, the trial court made conclusions regarding substantial compliance on the narrow basis of whether the needs of particular individuals about whom the court heard testimony were being met. The trial court's approach may have been necessitated by the failure of the State, working with the plaintiffs and the court master, to develop objectives and criteria by which compliance with the provisions of the settlement agreement could be more generally and positively measured, as required by paragraph 279 of the settlement agreement. However, the difficulty of measurement of substantial compliance emphasizes the need for more rigorous court supervision to promote development of better standards to measure compliance.

[¶ 72] As the *Olmstead* opinion observed, measuring substantial compliance with a statute, regulation, or settlement agreement by determining if the needs of a particular individual are being met would leave the State "virtually defenseless" once a particular individual shows that the individual is qualified for a particular service or program. *Olmstead*, 527 U.S. at 603–04, 119 S.Ct. 2176. Any publicly funded health care system, even if adequately supported, may be viewed as inadequate when judged strictly from the perspective of an individual in need of services. Interpreta-

tion of the settlement agreement must recognize this reality.

[¶ 73] *Olmstead* suggests a broader, system-based approach to measuring substantial compliance with the reasonable accommodation provisions of the ADA. *Id.* at 603–07, 119 S.Ct. 2176. A similar approach is appropriate to measure substantial compliance with those provisions of the settlement agreement that set subjective standards for care, treatment, and improvement of services. A system-based approach to assessing substantial compliance with court orders or consent decrees in institutional reform cases has support in federal case law. *See, e.g., Missouri v. Jenkins*, 515 U.S. 70, 101, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (stating "[t]he basic task of the District Court is to decide whether the reduction in achievement by minority students attributable to prior *de jure* segregation has been remedied to the extent practicable"); *Ass'n for Retarded Citizens of N.D. v. Schafer*, 872 F.Supp. 689, 708–10 (D.N.D.1995) (finding system-wide compliance with consent decree demonstrated, despite evidence of specific instances in which particular requirements had not been met).

[¶ 74] A system-based standard for measuring substantial compliance would evaluate whether (1) the State has identified the needs of individual class members, developed reasonably necessary resources to meet those needs, and addressed those needs in a timely manner; (2) the State is in substantial compliance with specific numerical goals and in reasonable compliance with the less objective

that various provisions of the settlement agreement appeared to require different standards of compliance, with some requiring reasonable efforts and others containing specific numerical standards. The former Superintendent of AMHI testified that for some paragraphs 100 percent compliance should

be the goal, for others the 85 percent standard suggested in standards for hospital accreditation reviews might be an appropriate benchmark, but flexibility would be needed depending on the criteria used to measure compliance.

goals and standards in the consent decree; and (3) the State's commitment of resources is reasonable, considering the State's many obligations, the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental illness, and the ultimate authority of the Legislature to raise and appropriate funds. Under this standard, substantial compliance could be achieved even if some individuals do not have all the services they need or want at all times.

[¶ 75] The provisions of the settlement agreement vary from broad goals to very specific numerical requirements. To evaluate compliance with settlement agreement provisions by determining whether selected class member's needs are being met sets the bar too high. For those broader provisions, where compliance with respect to every individual class member at all times is neither expected nor possible, the system-based method is the appropriate method to evaluate substantial compliance. For those provisions containing objective, numerical standards, stricter evaluation of compliance may be required. It must be remembered, however, that the court is measuring substantial compliance, not absolute compliance.

## IV. PART I CONCLUSION

[¶ 76] The great difficulty for the trial court and for us in determining substantial compliance is the State's failure to develop a comprehensive plan to meet the objectives of the settlement agreement, supported by adequate evaluation and reporting mechanisms to enable the court to measure progress toward substantial compliance. The settlement agreement assigned the State, working with the court master and the plaintiffs, the responsibility for developing the plan and the requisite evaluation and reporting mechanisms.

[¶ 77] The requirement of a "comprehensive system of internal monitoring, evaluation and quality assurance," by September 1, 1991, is stated in paragraph 279 of the settlement agreement. The agreement specifies that "[c]ritical data shall be collected and reported through an electronic data base system." The system was to include an "annual random statistically significant review of class members residing both at AMHI and in the community to measure defendants' compliance with this Agreement in meeting individual class members' needs and in protecting their rights under this Agreement."

[¶ 78] The trial court's determination that the State failed to develop a comprehensive plan to meet the objectives of the settlement agreement as required by paragraphs 36, 37, and 38, and failed to develop and implement the comprehensive evaluation system required by paragraph 279 is amply supported by the record. The court rendered detailed findings regarding the ad hoc approach taken by state officials regarding the measures they adopted, or failed to adopt, to measure compliance.[10]

10. For example, the court found in response to the testimony of the former Superintendent of AMHI that:

Superintendent Kavanaugh used the Consent Decree, data from the DHS and JCAHO surveys, input from senior staff, and her professional judgment and experience to determine that AMHI had complied with the Consent Decree requirements. *See* Defs.' Ex. 7. She did not have written standards for the AMHI requirements in the Consent Decree. She inquired whether AMHI was doing something or not and, if something was in place, whether it was reliable.

She initially testified that she had gone through the Consent Decree paragraph by paragraph, collected data, and made an assessment. Later, she admitted that the first time she had reviewed the Consent Decree

The degree of uncertainty the officials demonstrated regarding a requirement critical to the successful post-judgment implementation of the consent decree is difficult to understand.

[¶ 79] The fact that there is any uncertainty regarding the measures for monitoring compliance, this late into the post-judgment phase of this case, can only be explained by the State's failure to undertake a concerted and effective effort to implement paragraph 279.[11] There should be no further delay in the adoption of a system that will measure whether the requirements of the settlement agreement are being met.[12] The trial court's finding of contempt is affirmed as it pertains to paragraphs 36, 37, 38, and 279 of the settlement agreement.

---

to determine the standards relied on for compliance was during the trial.

She also used various reports. She believed the latest ones were the reports to the Court Master dated October and December 2001. In spite of the requirements of the Consent Decree, she admitted that for some provisions of the Consent Decree, AMHI collected no data. She was unable to recount the paragraphs for which no data was collected. She agreed in her deposition testimony that there were no written reports for every requirement in the Consent Decree pertaining to AMHI. For the paragraphs for which they did not have written reports, the standards used were determined by other regulatory agencies, including the DHS.

. . . .

Superintendent Kavanaugh had no benchmark for many of the requirements. If an area was not covered by DHS and JCAHO regulations, she used her professional judgment. If something specified 100%, her standard was 100%. She did not know which paragraphs of the Consent Decree require 100% compliance; she expected that other people would know. The JCAHO determination of "substantial compliance" requires a score of 85% or more and she would like AMHI to be better than that.

When asked specifically whether as of 1/25/02 there were deficiencies in AMHI's compliance with the requirements of the Consent Decree, Superintendent Kavanaugh responded that mental health is complex and there are always areas in which the hospital could do better. She refused to testify that there were any problems at AMHI. There were only "opportunities."

11. The trial court's findings reflect that the State may have recently made progress regarding the development of the electronic data base system required by paragraph 279. The court found:

The Department was awarded a three-year data infrastructure grant in 10/01. See Jt. Ex. 27. The objective is to have a common set of data elements in the state. The Department applied to continue the grant in the fall, 2001. See Pls.' Ex. 36. As a result, the grant continued at the rate of $100,000.00 per year for three years. In that 10/01 grant application, the Department stated that it currently lacked a consistent data collecting mechanism for some variables and admitted that it had no consistent and reliable mechanism to capture service encounter and performance data for community hospitals. See Pls.' Ex. 36, p. 6/16.

The grant will fund development of performance indicators to help integrate data sources into the Enterprise Information System (EIS). This system is intended to ensure that the data system is adequate and representative. The Department will have data regarding outcomes by 10/04. The link to provider agencies is not operational and is in the testing phase. The change to EIS has been delayed and no data have yet been sent to EIS because the Department did not want to address that task while it was in court.

12. The settlement agreement establishes a framework by which the parties may present any dispute regarding the comprehensive system of internal monitoring, evaluation, and quality assurance to the court master for decision. Accordingly, on remand, the court may refer this issue to the court master for a prompt determination. In addition, and in view of the passage of time, the court may also consider imposing a fixed and expedited schedule for the State's implementation of the monitoring and evaluation system approved by the court master.

[¶ 80] We also conclude that in the Part I Order, the trial court erred by interpreting substantial compliance to mean strict compliance with the settlement agreement in terms of identifying and meeting all individual patient needs, rather than interpreting substantial compliance to require a system-based evaluation of whether (1) the State has identified the needs of individual class members, developed reasonably necessary resources to meet those needs, and addressed those needs in a timely manner; (2) the State is in substantial compliance with specific numerical goals and in reasonable compliance with the less objective goals and standards of the consent decree; and (3) the State has assembled the resources necessary to achieve substantial compliance in the context of the State's broader financial obligations and the appropriation authority reserved to the Legislature.

[¶ 81] On remand, the parties, under the supervision of the court master, should proceed promptly to develop, in concert with the court, systems to evaluate and measure compliance with the settlement agreement. With those systems in place, the court, either on its own motion or when the State next files a notice of substantial compliance, should proceed to evaluate substantial compliance as of the time of the court's or the State's notice.

## V.  THE REMEDY

[¶ 82] The State contends that the trial court violated the separation of powers doctrine when it imposed a receivership over the operation of AMHI. The plaintiffs urge us to affirm the receivership as a valid exercise of trial court discretion.

[¶ 83] Under the Maine Constitution, judicial power is a limited power. The courts are constrained by our constitutional separation of powers to performing judicial functions within our dynamic system of checks and balances among the Executive, Legislative, and Judicial Branches of Maine State Government. Separation of powers of the Executive, Legislative, and Judicial Branches is mandated by Article III of the Maine Constitution. Article III states:

### § 1.  Powers distributed

Section 1.  The powers of this government shall be divided into three distinct departments, the legislative, executive and judicial.

### § 2.  To be kept separate

Section 2.  No person or persons, belonging to one of these departments, shall exercise any of the powers properly belonging to either of the others, except in the cases herein expressly directed or permitted.

ME. CONST. art. III, §§ 1, 2.

[¶ 84] In interpreting Article III, we have stated: "[T]he separation of governmental powers mandated by the Maine Constitution is much more rigorous than the same principle as applied to the federal government." *State v. Hunter*, 447 A.2d 797, 799 (Me.1982). *See also In re Dunleavy*, 2003 ME 124, ¶ 6, 838 A.2d 338, 343; *Bossie v. State*, 488 A.2d 477, 480 (Me. 1985); *Curtis v. Cornish*, 109 Me. 384, 391–92, 84 A. 799, 802 (1912). Any exercise of judicial authority over the Executive or Legislative Branches of State Government must be undertaken respecting these constraints.

[¶ 85] Before we reach directly any constitutional issue, prudent appellate review requires that we first determine whether the issue may be resolved on a basis that does not implicate the constitution. *Hannum v. Bd. of Envtl. Prot.*, 2003 ME 123, ¶ 18, 832 A.2d 765, 770; *Rideout v. Riendeau*, 2000 ME 198, ¶¶ 14–15, 761 A.2d

291, 297–98. Because the court employed an incorrect legal standard to evaluate substantial compliance, we need not address whether the appointment of the receiver in this case violated the separation of powers article of the Maine Constitution.

[¶ 86] Appointment of a receiver is a matter within the discretion of the trial court. *Dep't of Envtl. Prot. v. Emerson*, 563 A.2d 762, 767 (Me.1989). A court is justified in appointing a receiver when more common remedies, such as injunctive relief or contempt proceedings, have failed to achieve the objectives of a court order. *Id.* (citing *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir.1976)). Here, approximately six years passed without the plaintiffs or the court master seeking contempt or other remedies against the State. The question of whether appointment of a receiver was necessary to achieve substantial compliance should not have been entertained until less intrusive contempt remedies had been attempted.[13]

[¶ 87] We have determined that the trial court erred in its interpretation of the consent decree and settlement agreement regarding the standard for determining substantial compliance. In addition, we

have concluded that less intrusive remedies should have been attempted before the court considered whether the appointment of a receiver was necessary to achieve substantial compliance. In these circumstances, appointment of a receiver to operate and direct the affairs of AMHI was not a sustainable exercise of discretion.[14]

[¶ 88] The same may be said of the bad faith and contempt conclusions, except for the contempt conclusion as it pertains to failure to meet the requirements of paragraphs 36, 37, 38, and 279. A finding of contempt must be supported by clear and convincing evidence, considering all of the circumstances of the case. M.R. Civ. P. 66(d)(2)(D).[15] *See also Pratt v. Spaulding*, 2003 ME 56, ¶ 11, 822 A.2d at 1187. Remedial contempt requires that the court look to the status of events as of the contempt hearing. A finding of contempt is only appropriate when the court finds, by clear and convincing evidence, that a measurable violation of the settlement agreement has been committed and is continuing and that the State has the capacity to remedy the violation. M.R. Civ. P. 66(d)(2)(D). A necessary prerequisite to

13. Less intrusive remedies might include, but would not necessarily be limited to, adoption of more specific time limits to achieve certain objectively measurable goals, use of the court master and/or consultants to establish objective measurements or standards for determining compliance, requiring a planning and budgeting process for seeking staff and funds that is tied directly to each paragraph of the settlement agreement where substantial compliance has not been achieved, and amendment of the settlement agreement to improve specificity and promote better achievement of its goals in light of developments in the past fourteen years.

14. While the appointment of a receiver is vacated, the trial court, in the exercise of its discretion could retain the individual acting as receiver as a court-appointed expert to

assist it and the court master in evaluating progress in implementation of the settlement agreement.

15. M.R. Civ. P. 66(d)(2)(D) states:

All issues of law and fact shall be heard and determined by the court. The alleged contemnor shall have the right to be heard in defense and mitigation. In order to make a finding of contempt, the court must find by clear and convincing evidence that:
  (i) the alleged contemnor has failed or refused to perform an act required or continues to do an act prohibited by a court order, and
  (ii) it is within the alleged contemnor's power to perform the act required or cease performance of the act prohibited.

such a finding would be a proper standard for measuring substantial compliance and a review of the adequacy of the State's current effort and expanded resource commitments.

 [¶ 89] Here, the trial court only considered the status of events as of January, 2002,[16] and not as of the conclusion of the trial over one year later, and therefore failed to consider evidence of the State's more recent remedial efforts. In addition, it did not employ a proper standard for measuring substantial compliance. Accordingly, the courts' bad faith and contempt conclusions, apart from its conclusions associated with paragraphs 36, 37, 38, and 279, are not a sustainable exercise of discretion.

The entry is:

1. The findings of contempt for failure to comply with paragraphs 36, 37, 38, and 279 of the settlement agreement are affirmed.

2. Although we agree that the State could not carry its burden to establish substantial compliance with the 1990 consent decree and incorporated settlement agreement, the judgment is vacated in all other respects.

3. Remanded to the Superior Court to:

a. Remand to the parties under the supervision of the court master to establish a comprehensive plan that meets the requirements of paragraphs 36, 37, and 38 of the settlement agreement, and a system for evaluating and measuring compliance with the settlement agreement that meets the requirements of paragraph 279 of the settlement agreement. A short and specific timetable should be established for completion of this process.

b. With the comprehensive plan and system for evaluating and measuring compliance established and functioning, either on its own motion or on motion of the State, review and decide the question of substantial compliance in accordance with the provisions of this opinion.

---

16. The court was appropriately focused on whether the State had met its burden of establishing that it was in substantial compliance as of January 2002, as a substantial compliance determination would affect the time when the plaintiff class would close. However, in deciding if contempt was proven by clear and convincing evidence, the court was required to evaluate the State's remedial efforts in light of all of the evidence available at the conclusion of the hearing.