STATE OF MAINE
KENNEBEC ss

SUPERIOR COURT
CV-AP-14-57

DOUGLAS BURR,

        Plaintiff,

v.

RODNEY BOUFFARD, et al.,

        Defendants

**FINDINGS AND ORDER FOR ENTRY OF JUDGMENT**

## Background

This matter was tried before the Court on June 11 and June 12, 2019. The Plaintiff is represented by Attorney Eric Mehnert and the Defendants are represented by Assistant Attorneys General James Fortin and Jason Anton. The parties filed post-trial briefs, the last of which was received by the Court on August 15, 2019.

This case has a significant procedural history. On September 14, 2014 the Plaintiff filed a Petition under Rule 80C of the Maine Rules of Civil Procedure (Count I). He also brought two independent claims pursuant to 42 U.S.C. Section 1983, the first for Injunctive Relief (Count II) and the second for damages, including punitive damages (Count III). On November 25, 2014 the Defendants filed a Motion to Dismiss the claims in Counts I and II as moot, which the Court denied by Order dated March 23, 2015. In that Order the Court concluded as a matter of law that the Defendants could not hold the Plaintiff indefinitely pursuant to its disciplinary regulations, and that the Plaintiff had adequately pleaded a claim for injunctive relief under 42 U.S.C. Section

1

1983 as he had a liberty interest not to remain confined in the Special Management Unit without due process.

On April 6, 2015 the Defendants filed a Motion to Reconsider, arguing that the Court had conflated the sanctions imposed on Plaintiff pursuant to the disciplinary policy with a separate decision, made pursuant to the Department's administrative segregation policy, to place the Plaintiff in the SMU. This was the first time the Defendants represented to the Court that Plaintiff had been confined in the SMU primarily pursuant to its administrative segregation policy and not solely for a disciplinary violation. On August 18, 2015, the Court denied that Motion from the bench after oral argument, and a Scheduling Order was issued. On August 27, 2015 the agency record was filed by AAG Fortin, and on August 31, 2015 he filed a letter with the Court stating that he mistakenly advised the Court during oral argument that the Rule 80C record had been expunged by the Department of Corrections as it had not. A Consent Confidentiality Order was issued on February 5, 2016. On May 10, 2016 the Plaintiff filed his Rule 80C Brief pursuant to the (extended) Scheduling Order, along with a Motion for Partial Summary Judgment on Counts II and III of his Complaint. On July 1, 2016 Defendants filed their Cross Motion for Summary Judgment.

By Order dated January 27, 2017 the Court granted the Defendants' Motion for Summary Judgment on Count III for damages. It granted the Plaintiff's Rule 80C Appeal in part, and ordered additional briefing by the parties on the Defendants' claim that Plaintiff's remaining claims were moot, and that no exception to the mootness doctrine applied to those claims. On July 14, 2017 the Court denied the Defendants' Motion for Summary Judgment, finding that the mootness exception for questions of great public concern applied to Plaintiff's claim for

2

declaratory and injunctive relief in Count II. On August 17, 2017[1] the Defendants filed a Supplemental Motion for Summary Judgment which was denied on January 2, 2018. The case was set for trial more than once, but was continued by agreement of the parties.

The Court has reviewed the trial transcripts and exhibits, along with the video trial testimony of Plaintiff's expert, Larry Reid, and issues the following findings and conclusions.

## Findings

Plaintiff is serving a 59-year sentence at the Maine State Prison for murder. Between mid-September of 2014 and early 2016 Plaintiff spent approximately 22 months in what Defendants refer to as "restrictive housing." For the first approximately 10 months of his time in restrictive housing Plaintiff lived in what the parties agree is the most restrictive unit at the Maine State Prison. The parties do not exactly agree on how the cell in which he was housed compares with cells in other parts of the prison, but the Court finds that it was approximately 8 feet by 12 feet. Two days a week he was locked in his cell for 24 hours. He was allowed only three showers a week, recreation was limited to five hours per week and while on recreation he was in hand and feet restraints. Meals were delivered through a slot in the door. He was allowed only one "no contact" visit, and one phone call per week.

Both Plaintiff and Deputy Warden Ross described the conditions as chaotic, with people yelling, banging on doors, throwing feces, engaging in self harm, and being subject to extractions when prisoners are removed forcibly from their cells for misbehavior. Plaintiff testified that "...and not only that, you have to deal with everything that's going on around you. There's constantly people self-harming themselves down there. So there's blood in the corridors at all

---

[1] The motion was erroneously dated August 17, 2016.

3

times – not at all times, but daily or weekly there's a lot of people hurting themselves. So you have no choice but to deal with that, because it's basically right in front of you." *Id.* at 65; (Trial Transcript June 12, 2019, pg. 84).

The parties agree that Plaintiff was initially placed in segregation after the prison's Inner Perimeter Security Team began investigating the Plaintiff and his wife for drug trafficking. On June 12, 2014 Deputy Warden Ross ordered that Plaintiff be placed on "Emergency Observation Status" (EOS) pending further investigation into the trafficking allegations. An incident report was entered into CORIS which is the prison's electronic data base. At the same time, Corporal Mark Engstfeld filled out a "disciplinary report" and charged Plaintiff with "trafficking" as defined by the Department of Corrections regualations. The shift supervisor, Ken Vigue, did not sign the report as required within the 72 hours required by Department policy because, according to Corporal Engstfeld, it just "fell through the cracks." (June 11, 2019 Trial Transcript, pg. 150).[2]

The parties do not agree on how long Plaintiff remained on EOS status in the prison infirmary, and they do not agree on what the justification was for initially holding him in segregation. While it is clear that the Plaintiff underwent a disciplinary hearing, they do not agree as to whether the 20 days that were imposed as the sanction was served in "D-seg" or "A-Seg" or even when he was actually serving the 20-day sanction. The confusion is compounded by the position taken on earlier in this litigation by the Defendants that the Plaintiff was held in segregation pursuant to the prison's disciplinary process while now, according to the Department's brief, he was placed on "administrative segregation" as early as June 14, 2014 pending investigation into the trafficking allegations. According to the Defendants, after his June

___

[2] The State's position was that this failure to adhere to the 72-hour rule was the reason that it "dismissed" the discipline proceedings against Plaintiff and effectively conceded the Plaintiff's Rule 80C claim. (*Id.* at pg 146). After trial, the parties filed a Joint Stipulation that states that Plaintiff's disciplinary case (MSP-2014-1138) was expunged as of January 30, 2017.

4

14, 2014 placement in segregation, Plaintiff's status was reviewed "frequently" pursuant to policy. The Department argues now essentially that he was being held in "ad seg" while "simultaneously" waiting for the discipline process to unfold.

The disciplinary hearing scheduled for June 23, 2014 was apparently continued at the Plaintiff's request and rescheduled for July 14, 2014. The Court finds that at some point prior to that hearing the Plaintiff was either read or given a copy of a report done by Capt. Engstfeld on June 26, 2014 which was based in large part on the CORIS summary. At the hearing, Plaintiff did not call any witnesses or offer any defense as he was concerned with the possibility of criminal charges. He was adjudged guilty of trafficking, and 20 days of disciplinary segregation were imposed as punishment. He also lost 20 days of good time and received a $100 fine.

On August 22, 2014 Capt. John Howlett recommended that Plaintiff be released from "ad-seg" and begin serving his 20-day disciplinary sanction. He gave two reasons for this recommendation. As he testified, "there was no reason for him not to go do his D time" and "to be honest with you I had never had any problem with him." *Id.* pg. 265, 269. That decision was overridden by Dep. Warden Ross on August 25, 2014. *Id.* pg. 26.

Plaintiff's Rule 80C Petition was filed on September 4, 2014 after the discipline was internally affirmed within the prison. On December 17, 2014 pursuant to another review, Capt. Howlett once again recommended that Petitioner be removed from administrative segregation stating that "I wouldn't recommend a release if he had been a problem" at the time. *Id.* pg. 271. This was also denied by Dep. Warden Ross. On January 14, 2014 Capt. Howlett recommended

---

It is not disputed that the maximum punishment that the prison can impose for a disciplinary violation is 30 days.
The Department responded to the Petition by dismissing the disciplinary violation and vacating the sanctions. His disciplinary record was not expunged until January 30, 2017.

for the third time that Plaintiff be removed from administrative segregation, and Dep. Warden Ross again over-ruled the recommendation.[5]

By April of 2015 the parties agree that the Plaintiff was transferred to the Administrative Control Unit" (ACU) of the prison. This unit provides more privileges than those available in administrative segregation but is still significantly more restrictive than general population. The ACU provides a "level system" that allows for increased privileges as the prisoner progresses. Plaintiff agreed that he had more privileges in the ACU in that he was allowed an AM/FM radio, a hot pot to heat water in his cell, and he was allowed more visits and phone calls. He remained in the ACU until late March 2016 when he was finally returned to general population.

Dr. Joseph Fitpatrick was Commisioner of the Department of Corrections in June of 2014[6] when Plaintiff began his placement in "restrictive housing." He testified that when a prisoner was placed in administrative segregation his status is supposed to be reviewed frequently by a "team" of correction officers who vote on what should happen to the prisoner's placement. The Warden or Warden designee can then overrule the recommendation of the team. He stated that he understood that Plaintiff was placed in segregation for "trafficking in prison contraband" but agrees Plaintiff was never specifically alleged to present a threat to other prisoners in the sense of having made any direct threat of physical harm. He testified, however,

---

[5] Capt. Howlett explained that he was never told why Dep. Warden Ross kept overruling the recommendations, but acknowledged "And it's like I said, I don't know what he knows, I mean I can only go so far as for what I know." *Id.* pg. 272. He also said that a large majority of the ad seg board's recommendations were followed by prison administrators, and the prisoner would be released from administrative segregation: "What would be recommended by the ad seg board, when we was doing them, then they would get released. Unless it was more than – most of the time if they came down and we did a board and then said, okay, well, he's got disciplinary time. Go ahead and release him from ad seg – or his ad seg and put him on his D time, get it out of the way, and then they would move them out. Sometimes if you do your D time you don't actually move. If you're doing disciplinary segregation time and you're on ad seg, it's just a matter of a status change. If you have 30 days to do, I'm not going to move you two cells down, okay? *Id.* pg. 272-73.

[6] Dr. Fitzpatrick still works for the Department as Clinical Director and oversees medical and mental health services. He has worked for the Department for approximately 25 years and was originally appointed acting Commissioner in April of 2014 for six months before being confirmed as Commissioner.

that trafficking in contraband can result in threats being made and violence occurring. He stated, "I think any time you introduce an element that's a commodity that people are willing to hurt other people for, you have a possibility of physical violence."

There is nothing in the record to support any finding that the Plaintiff physically attacked or made any threat of violence to any individual in the days or months leading up to his confinement in restrictive housing. There is also nothing in the record that supports any finding that he engaged in any misconduct of any kind during the 22 months he was kept out of general population.

Dr. Fitzpatrick testified that he was not directly involved in reviewing Plaintiff's status in ad-seg, and that conducting disciplinary hearings was never a part of his job as Commissioner. He stated he would have been aware of the Rule 80C appeal filed in the Superior Court in September of 2014. He also did not recall when he became directly involved in the reviews conducted of Plaintiff's status while he was in the ACU, but Plaintiff's Exh. 12 shows that Dr. Fitzpatrick affirmed the Plaintiff's initial placement into the ACU on April 9, 2015. He also did not recall any specifics regarding the reasons why Plaintiff was retained in the ACU, but that in February of 2016 he was presented with an appeal by Plaintiff 'of a decision to keep him in the ACU. He concluded that the proffered rationale for keeping him in the ACU – the requirement that Plaintiff admit that he was engaged in "trafficking" before he could return to general population– made no sense, and served no legitimate criminological purpose. Plaintiff testified that he had been told over an extended period of time that he was going to remain in restrictive housing until he admitted that he was "trafficking." Dr. Fitzpatrick agreed that it was not appropriate to use restrictive housing, either ad-seg or ACU, as a method to extract information

---

· The parties agree that Plaintiff was encouraged to appeal this decision by Ryan Thornell who Dr. Fitzpatrick hired specifically to review and reform MSP's policies and practices on segregation.

7

from inmates. *Id.* pg. 54. He stated, "Because quite honestly, based on Mr. Burr's time that he had already served in segregation and the amount of programming that he had done, I did not see the end point of him admitting to something. I didn't see that that brought us anywhere in terms of his rehabilitation...quite honestly, the literature is all over the place on acknowledgement of a crime and whether that aids or doesn't aid your progression in treatment and rehabilitation. So there's no solid reason to force an admission." *Id.* at 22, 23.

Correctional Consultant Larry Reid testified for the Plaintiff. He does training for National Institute of Corrections on how to "manage people who are in a high level of confinement." (Trial Deposition, pg.5). He stated that he focuses on "the constitutionality issues and concerns that are prevalent...in restrictive housing." *Id.* He noted that the trend nationally is to reduce the number of prisoners who live in restrictive housing. The reason for the shift he explained is the recognition that restrictive housing has negative impacts on prisoners and "does not change behavior." *Id.* He has worked for the Colorado Department of Corrections off and on since 1987 including working as the Director of Central Classification which entailed making sure that all classifications were appropriate, and that all policy and procedures were followed. *Id.* pg 8. Over the course of his career he has worked at five different facilities as Warden, including at a mental health prison, two "supermax" prisons and a prison for women. He gave examples of the types of classifications that prisoners are given and how that affects their housing and programming. He has also been extensively involved with the Department of Justice's National Institute of Corrections to create a program for people who live in administrative segregation and how to enable them to progress out of that kind of housing through a "structured process – extensive reviews, extensive documentation" and return to general population. He has worked with over 45 states as a consultant, and has testified as an

expert witness approximately twelve times about restrictive housing-related issues in Colorado, Florida, Wyoming and Florida. *Id.* pg. 16, 19.

Mr. Reid testified that the policies of the Maine Department of Corrections that he reviewed were problematic in that they allowed for personal interpretations of important terms and functions, and that the policies were not consistently reviewed, updated or even signed by the appropriate DOC commissioner. He also described the policies as being "incongruent" in that it was difficult to determine what the actual process was for placing prisoners in restrictive housing. He stated that it was troubling from his review of the depositions of the staff involved in the Plaintiff's case that they could not even agree on what the process was. He noted that one of the hearing officers in Plaintiff's case had received no training on how to run such a review hearing, contrary to stated policy. *Id.* pg. 28. He testified that staff could not agree on what the EOS policy was and how it was applied in this case. He stated that sometimes the Plaintiff was accused of attempting to introduce contraband to the facility, and sometimes accused of actually accomplishing that. *Id.* pg. 29-30. He testified that a prisoner could be placed in EOS if they posed a "threat to the safety of others" but that "threat" was not defined, leaving any correctional official to use their own subjective and personal definition of threat to "immediately remove" someone from general population. *Id.* pg. 32. He stated that to him, the definition of "threat" as applied to the Plaintiff, given the amount of time the Plaintiff was out of general population, had to mean that he had made a "physical threat." However, he noted there was just no evidence that Plaintiff had made such a threat. Given this lack of succinct, concrete definitions, staff had a very

difficult time following the policy, and a prisoner could not fairly defend him or herself against an allegation of being a "threat". [*]

He also concluded that the Plaintiff's due process rights were violated in that the review hearings were done by staff that were not impartial, and that the allegations against Plaintiff were consistently and repeatedly misidentified throughout the process. More fundamentally, he stated that the Plaintiff's due process rights were violated in that throughout his extended stay in segregation they could articulate no reason for keeping him there. In other words, as stated above, over a 22-month period he exhibited no conduct that would suggest that he was a threat to anyone. *Id.* pg. 43. He noted the lack of planning in the reviews conducted for Plaintiff's return to general population which meant that the Plaintiff could have no way to know what, if anything, he could do to work or earn his way out of segregation. That is, instead of providing objective criteria – including a case management plan with goals, recording of observation of how he progressed in the plan, and how he interacted with others – for Plaintiff there was "no light at the end of the tunnel." *Id.* pg. 70

In June of 2015 Ryan Thornell was hired by the Department of Corrections as Director of Correctional Programming, and shortly thereafter was tasked with reviewing and then reforming the prison's "restrictive housing initiatives." (June 12, 2019 transcript, pg. 106). Now the Deputy Commissioner of DOC, he recalls being directed by then Commissioner Fitzpatrick to change the segregation practices at the Maine State Prison "which stemmed back to the Frontline documentary that was aired worldwide showing the conditions of restrictive housing at the Maine State Prison." *Id.* pg. 108. At the same time, the Department of Justice in early 2016

---

[*] Mr. Reid testified that initially he had concluded that Plaintiff had not actually been placed in EOS status based on the documents provided but two days before his testimony the EOS documents were located and, he amended his opinion accordingly.

established "the framework and goals" nationally for restrictive housing. *Id*. pg. 109. In March of 2016 he and Commissioner Fitzpatrick attended a training put on by the National Institute of Corrections where Plaintiff's expert Larry Reid was one of the presenters. *Id*. pg. 110.

Mr. Thornell described the numerous changes he soon implemented. He established what he described as a system of "accountability" that included layers of review "that take place at different intervals and time from emergency observation statuses to administrative segregation statuses....And we modified the makeup of those boards. They were traditionally done by security staff, correctional officers and sergeants, and we wanted a multidisciplinary approach...and we also integrated behavioral health staff into those reviews." *Id*. pg. 112. Importantly, anyone who was in segregation had their status reviewed every week by a group of up to 20 individuals from a variety of disciplines. He explained that "the philosophy I was putting in place is every client in restrictive housing, whether those existing in there or coming in, should have an idea – a legitimate idea of why they're there and what it's going – what's going to be expected of them while they're there and then what it's going to take to transition out of there, depending on how long their stay is." *Id*. pg. 113.

When Mr. Thornell began implementing the reforms, the ACU existed, but he stated that "it mirrored more of the administrative segregation process" and needed reform. *Id*. pg. 115, 116. He developed what he described as "a parole sort of process" where the board would meet and review information, and "the client would come in and present his case to the board, questions would be asked, clarifications, all of that, if it (sic) necessary. And then the client would step out and the board would deliberate, the client would step back in and then a decision would be communicated..." *Id*. at 116, 117.

11

In addition, Commissioner Fitzpatrick ordered that "any placement of a prisoner into a segregation unit had to be approved by myself at any time of day, any day of the week, there were no exceptions to that." *Id.* at pg. 118. This meant that "restrictive housing was to be reserved for those who were the most serious and violent threats to the safety and security of the facility, the safety and security of staff and other prisoners, or a threat to escape from the facility. And that was a change, because (while) those criteria were laid out in policy, there's a lot of leeway in interpreting those criteria." *Id.* at 118. He further explained that in his view "threat" meant "not any sort of secondary or indirect incidents or violence associated with that...was he or she the aggressor, were they bystanders...those sorts of questions, to make sure we were really reserving restrictive housing for those who were violent, you know, predators, really within the facility, those who were completing harm against others within the facility." *Id.* at 119-120.

In addition, the conditions of the ACU are now completely different than they were when Plaintiff was confined there, as it now is a "more modern, open dayroom setup" that houses fewer inmates (16 in each instead of 50) that are more open, and prisoners have access to a recreation yard. *Id.* pg. 126. He described it as a "programmatic unit" where the prisoner begins a step-progression back towards general population. *Id.* pg. 126. In 2018 Mr. Thornell testified that they hit an "all time low" population of just six prisoners in restrictive housing. He noted that it had increased since to between 16 and 20 but that the increase corresponded to an increased prison population overall during the same time frame. *Id.* at 132.

Mr. Thornell testified that while he believed Plaintiff's status in the ACU in June of 2015 "was appropriate" under the policy in place at the time, as he had been allowed by then to come

out of his cell and engage in programming, it would not in his view meet the criteria established by the new regulations.

In February of 2016 Mr. Thornell sat on a review board involving the Plaintiff's placement in ACU which found against the Plaintiff. When the Plaintiff appealed, Mr. Thornell discussed Plaintiff's case with Commissioner Fitzpatrick, and it was decided that it was time to place him back in general population. *Id.* at 149.


## **Standard of Review**

A prisoner subjected to prolonged solitary confinement is entitled to periodic meaningful review to ensure that segregation is not a "pretext for indefinite confinement." *Hewitt v. Helms,* 459 U.S. 460, 477 (1983). The Court previously held in this case that Plaintiff had a liberty interest in not being confined in segregation for over 20 months without due process. [Order on Motion to Dismiss, 3/25/15, relying on *Wilkinson v. Austin,* 545 U.S. 209 (2005)]. No evidence presented by either party at trial persuades the Court to reverse that preliminary finding.

As noted above, the parties do not really dispute the conditions under which Plaintiff was housed during these 22 months, and it is not lost on the Court that the thrust of Defendant's argument at this stage of the proceedings is that they came to recognize that the conditions at the MSP endured by Plaintiff merited urgent reforms which they claim have now been accomplished. More fundamentally, the Court has concluded after reviewing the evidence that the Plaintiff's due process rights were violated in that the process for reviewing his segregation status was not meaningful as required by law. No prisoner in Plaintiff's position could know what it was he or she had to do to leave the highly restrictive confinement imposed on him given

13

the processes in place at the prison during the times pertinent to this case. The process, as Mr. Reid noted, was inconsistent and incoherent, and important decision-makers could not agree on when Plaintiff was in disciplinary segregation, when he was in administrative segregation, and what exactly he had done to justify his separation from general population for such an extended time. The clearest violation of his due process rights was the failure on the part of the Defendants to provide basic, meaningful information to Plaintiff about how he could earn his way out of segregation. The Court notes that former Commissioner Fitzpatrick, current Deputy Commissioner Ryan Thornell, and Mr. Reid all agree that it was inappropriate to keep Plaintiff in segregation until he admitted something he was not likely to ever admit. They agree that this kind of coercion serves no legitimate purpose, particularly after whatever discipline process occurred was deemed defective by the prison. Considering this evidence as a whole, the Court concludes that the review process provided fell below the constitutional standard.

## Available Remedies

The issue before the Court then becomes whether the Plaintiff is entitled to the equitable relief he seeks. Damages are no longer a viable remedy as on January 26, 2017 Summary Judgment was entered for Defendants on Count III on Plaintiff's claim against Corporal Mark Engstfeld. In that Order the Court concluded that even viewing the evidence in the light most favorable to Plaintiff, no reasonable juror could conclude that Corporal Engstfeld played a substantial role in causing Plaintiff to be retained in segregation. As the Court noted, the evidence in the Summary Judgment record showed "at worst, that Cpl. Engstfeld backdated the Disciplinary Report to justify" Plantiff's *initial* placement on EOS. The Court concluded that

14

Corporal Engstfeld was "not responsible for or contributed to the decision" to keep Plaintiff in segregation for such a lengthy period of time.[9]

Defendants argue that given the undeniably significant changes that have occurred at the MSP regarding segregation practices, the Court's prior finding of a public interest exception to the mootness doctrine based on the Summary Judgment record is now "inapposite." (Defendant's Trial Brief, pg.1) Alternatively, they argue that even if the Court finds that Plaintiff's rights have been violated that the Court should decline his request for any form of equitable "relief from a restrictive housing program that no longer exists," and that the doctrine of separation of powers "strictly limit the circumstances in which the judiciary may superintend the policy choices of executive agencies."[10] *Id.* pg. 2.

Defendants also argue that in any event what happened to Plaintiff does not amount to a violation of his constitutional rights justifying any equitable relief because "unlike disciplinary segregation, administrative segregation is forward-looking and is utilized to protect the security and safety of correctional staff and residents." *Id.* This argument is undercut in two ways, the first being that it contradicts the original position taken by the Defendants that the Plaintiff's prolonged stay in segregation was pursuant to their discipline policy; secondly, and more importantly, is by the finding made above by the Court as to how urgently the Defendants made significant changes to their segregation practices during the pendency of this litigation. In any event, it is simply not accurate to describe the chaotic and inconsistent process that resulted in 22 months of segregation as simply "one-off infringements of policies and procedures, that, while regrettable, do not justify the judicial intervention he seeks." *Id.*

---

[9] The Defendants conceded that it had not adhered to certain time frames required by the disciplinary process and the Court on January 26, 2017 also entered Judgment for the Plaintiff on Count I, the Rule 80C appeal.

However, the Court does have to consider whether the remedy sought by Plaintiff is permissible under Maine law. While the Court does not agree with the Defendants that no constitutional violation occurred, it does agree that the remedy requested presents significant concerns regarding the Court's authority to order any relief in addition to that already provided under the Administrative Procedures Act and Rule 80C of the Maine Rules of Civil Procedure. Plaintiff is effectively asking the Court to order the Defendants to create and implement certain policies which have not been duly enacted as part of any rule-making process. Those would include, but not be limited to, requiring the Department to adopt a policy prohibiting the Defendants from holding a person in segregation in order to extract an admission of culpability from them, and one setting a limit on the number of days in which a person can be held in segregation. The fundamental problem with the argument, however, is that this Court concludes that it lacks any sort of authority to create policy, or to engage in rule-making. While the Court is aware that under some extraordinary circumstances some courts outside of this jurisdiction have intervened to take over in some way the day-to-day decision making of prison officials, it is clear to the Court that it cannot do any of those things given the significant changes implemented by Defendants to reform their segregation practices while this litigation has unfolded.

In *Bates v. Department of Behavioral & Developmental Services,* 2004 ME 154 the Superior Court, after twice having found the Defendant in that case in contempt of the Augusta Mental Health Institute (AMHI) Consent Decree, appointed a receiver to take over many of the day-to-day operations of the AMHI. The Law Court reversed the order appointing the receiver, and made it clear that any such intervention by the Courts in the operational decisions of another branch of government, even under the exceptional circumstances presented in that case, runs afoul of the separation of powers enshrined in Article III of the Maine Constitution. The Court

16

noted that the judicial power under the Maine Constitution is a "limited power" which requires that "any exercise of judicial authority over the Executive and Legislative Branches of State Government must be undertaken respecting these constraints." Par. 83, 84. Importantly for purposes of this case, in vacating the Superior Court order appointing a receiver, the Law Court noted that by the time the Superior Court considered what remedies to impose for violation of the Consent Decree, it failed to account for "review of the adequacy of the State's current efforts and expanded resource commitments." *Id.* at par. 88.

In this case, the Court finds the testimony of Deputy Commissioner Ryan Thornell to be particularly credible and compelling regarding the current and ongoing efforts made by the Defendants to review and reform its restrictive housing policies. While it is not possible to be certain what motivated these changes, it seems likely to the Court that it was the Frontline documentary which Mr. Thornell and Dr. Fitzpatrick agreed placed the Maine State Prison in a very negative light for its conditions and rates of segregation. This, together with training that Mr. Reid provided to Dr. Fitzpatrick and Mr. Thornell, has undeniably resulted in a more coherent and consistent discipline process, with many fewer prisoners spending extended time in segregation. The Plaintiff seems to concede that conditions have significantly changed, but nevertheless asks the Court to do what it is not permitted to do, which is to write rules and make policy even after the offending conditions have clearly been ameliorated.

## Conclusion

To be clear, the Court finds that Plaintiff has a protected liberty interest in not being confined in segregation without due process, and the United States Supreme Court has found that to require a process of "meaningful periodic review." The Court further finds that the process of review provided fell short of that constitutional standard for the reasons articulated best by Mr.

17

Reid, and the Defendants only makes a tepid attempt to argue to the contrary. However, the only remedy that the law permits this Court to provide, given the significant changes that have taken place at the MSP, is the one provided previously in this litigation, namely an entry of Judgment in Plaintiff's favor on Count I of the Complaint for relief of agency action, and final entry of the Order on that Court that requires the return of good time, and the vacating of any fine imposed.

The entry will be: Judgment will be entered for the Plaintiff on Count I of the Complaint. Judgment will be entered for Defendants on Counts II and III of the Complaint.

9/24/19
**DATE**

**SUPERIOR COURT JUSTICE**

18

STATE OF MAINE                              SUPERIOR COURT
KENNEBEC, SS.                               LOCATION: AUGUSTA
                                            Docket No. AP-14-57


                                    )
DOUGLAS BURR,                       )
                                    )
            Petitioner,             )
                                    )
    v.                              )       ORDER ON RESPONDENTS' MOTION
                                    )              TO DISMISS
RODNEY BOUFFARD, et al,             )
                                    )
            Respondent.             )
                                    )


        Respondents Maine Department of Corrections ("Department"), David Allan,

Harold Abbott, Kenneth Vigue, Mark Engstfield, Troy Ross, and Rodney Bouffard move

to dismiss the Petition for Review and Complaint of Petitioner Douglas Burr. Count I of

the Petition is styled as a M.R. Civ. P. 80C appeal, which requests that the court find the

Respondents have continuously and systemically violated the polices and procedures of

the Maine Department of Corrections ("Department") and requests that: 1) Mr. Burr be

re-classified to medium custody, removed from the Special Management Unit ("SMU"),

and transferred to the Windham Correctional Center, 2) have his contact visits re-instated,

3) have his good time re-instated, 4) have the disciplinary infraction expunged from his

file, and 5) award him costs and attorney's fees. Count II of the Petition is a "42 U.S.C. §

1983" claim against the Respondents seeking injunctive relief to transfer Mr. Burr from

SMU to the Maine Correctional Center. Count II also seeks the payment of Mr. Burr's

attorney's fees incurred in bringing the present action. Count III is another 42 U.S.C. §

1

1983 claim asserted against respondent Mark Engstfield, a corporal at the Maine State Prison, claiming he falsified a disciplinary report causing injury to Mr. Burr.

Respondents assert Count I of the Petition should be dismissed as moot because the Department decided to reverse its decision, restore Mr. Burr's lost good time, refund the fine imposed against him, and expunge his disciplinary record. In other words, Respondents claim the matter is moot because Mr. Burr received all possible relief requested. Respondents also assert that Count II of the Petition fails to state a claim upon which relief can be granted because the disciplinary proceedings and sanctions imposed on Mr. Burr do not implicate his due process rights.[1]

Mr. Burr contends the appeal is not moot because the Department continues to hold him in the SMU based upon the now expunged disciplinary complaint. Mr. Burr further claims his 42 U.S.C. § 1983 claim survives because his confinement in the SMU constitutes an "atypical and significant hardship" triggering the due process clause.

### I. Background

Mr. Burr is an inmate at the Maine State Prison. On or about June 12, 2014, Deputy Warden Troy Ross directed that Mr. Burr be removed from the general population at the Maine State Prison and placed on Emergency Observation Status ("EOS") in the SMU. Mr. Burr contends that SMU is the euphemistic name for solitary confinement at the Maine State Prison. Later that day, at 5:45 p.m. Corporal Engstfield allegedly wrote a disciplinary report at the request of Deputy Warden Ross, which ostensibly identified the reasons why Mr. Burr was to be placed in the SMU. Mr. Burr alleges he was not provided a copy of the paperwork placing him on EOS in the SMU

---

[1] Respondents do not move to dismiss Count III of the Petition and Complaint.

2

and did not sign any paperwork acknowledging that he was being placed on EOS in violation of Department Policy 20.1. Respondents contend Mr. Burr was written up for the disciplinary offense of trafficking.

Mr. Burr also alleges the Shift Supervisor, Captain Ken Vigue, did not acknowledge Corporal Engstfield's report until June 19, 2014 at 18:30 hours. This was more than 168 hours after the alleged behavior was observed or discovered and in violation of Policy No. 20.1.

Corporal Engstfield's report allegedly identified Mr. Burr's Housing Unit as MSP/SMU/B Pod/B122/B, but Mr. Burr was not assigned to that unit until five days after Corporal Engstfield wrote the report. Furthermore, Corporal Engstfield allegedly based the evidence supporting his report as stemming from a "Confidential Report." Corporal Engstfield, however, indicated that he secured the "Confidential Report" on June 19, 2014, the same date the disciplinary report was acknowledged as received by Captain Vigue. Mr. Burr contends that given the timing of the events, it appears that Corporal Engstfield falsified the information on the June 12, 2104 disciplinary report, which led to Mr. Burr's placement in the SMU.

Respondents contend that a disciplinary hearing was held on June 20, 2014, at which Mr. Burr was found guilty of trafficking and sanctioned the loss of 20 days good time, 20 days disciplinary cell restrictions, and fined $100.00. Mr. Burr timely appealed the decision pursuant to the Administrative Procedures Act, 5 M.R.S. § 11001 and M.R

3

Civ. P. 80C.[2] Mr. Burr contends the untimely nature of this hearing required Captain Vigue to dismiss the Disciplinary Report under Policy No. 20.1.

Following Captain Vigue's review of the Disciplinary Report, the Department scheduled a disciplinary hearing for July 8, 2014. The hearing was subsequently postponed until July 14, 2014, but Mr. Burr allegedly did not receive a continuance form. The hearing officer unit manager David Allan, who allegedly had not received the required training by the State of Maine Attorney General's Office, conducted the hearing. Hearing Officer Allan and Captain Harold Abbot allegedly refused to provide Mr. Burr an opportunity to review and contest the evidence used against him. Hearing Officer Alan subsequently found Mr. Burr guilty of a disciplinary infraction.

Mr. Burr timely appealed the July 14, 2014 decision and on August 8, 2014, Deputy Warden Troy Ross denied Mr. Burr's appeal and affirmed the recommended decision of the disciplinary officer. As noted above, Mr. Burr contends Deputy Warden Ross was the individual who had directed that a disciplinary report be brought against him in the first place. Mr. Burr timely appealed Deputy Warden Ross's decision.

Following the appeal, the Department decided to reverse the aforementioned decision. The Department contends that it restored Mr. Burr's lost good time, refunded the fine imposed, and expunged the discipline from Mr. Burr's record.[3] Furthermore, the Department contends it will reimburse Mr. Burr's filing fee if the case is dismissed. The Department has not, however, permitted Mr. Burr's wife to visit, or moved him out of SMU. As of February 3, 2015, Mr. Burr remained in the SMU and Respondents' counsel

_____

[2] Mr. Burr does not mention the June 20, 2014 disciplinary hearing, but does not dispute it took place.
[3] In the process of expunging Mr. Burr's disciplinary record, the Department claims it expunged the underlying administrative record.

indicated there were no plans to remove Mr. Burr therefrom. To the contrary, counsel for Respondents represented that Mr. Burr could be held in the SMU indefinitely.

## II. Argument

Respondents move to dismiss Mr. Burr's Petition and Complaint, "[h]owever, if a party files a motion to dismiss and documents outside the pleadings are presented to, and not excluded by, the trial court, [it is] treat[ed] as one for a summary judgment." *Libner v. Maine County Comm'rs Ass'n*, 2004 ME 39, ¶ 7, 845 A.2d 570. Here, while the Respondents did not submit any documents outside the pleadings, their entire motion to dismiss is premised on a contention that is outside the pleadings. Namely, that following Mr. Burr's appeal, the Department decided to reverse its decision imposing disciplinary sanctions on him. Because Mr. Burr does not dispute that the Department reversed its decision, the court will accept this fact as true for purposes of the present motion.

Accordingly, Mr. Burr must establish a prima facie case for each element of his claims in order to survive Respondents' motion. *Bonin v. Crepeau*, 2005 ME 59, ¶ 8, 873 A.2d 346. In adjudicating Respondents motion, the court views the evidence in the light most favorable to Mr. Burr and must draw all reasonable inferences in his favor. *Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745.

### A. Whether Count I of the Petition is Moot

Respondents contend the Petition is moot because the Department restored the lost good time, refunded the fine imposed, and expunged Mr. Burr's disciplinary record. The Department also notes that it will reimburse Mr. Burr for any filing fee he has paid. Accordingly, the Department contends Mr. Burr's Petition is moot as he received all the relief the court could have ordered.

Mr. Burr counters that the Petition is not moot because he remains in the SMU and has not been allowed to see his wife for over 180 days. He challenges the Department's alleged justification for continuing to impose restrictions under Department Policy No. 20.1, which provides, in pertinent part:

> Conduct constituting a disciplinary violation may result in changing a prisoner's custody level, housing status and/or programs, or the taking of any other action based on a determination that such action is in the interest of the prisoner, the interest of the prison population, or the interest of safety, security, or orderly management of the facility, regardless of whether the disciplinary process is initiated and if initiated, regardless of whether the conduct leads to an informal resolution or formal resolution of the violation. A dismissal or a finding of not guilty does not preclude taking such action. Such action is not in the nature of punishment.

03-201 C.M.R. ch. 20, §20.1, Procedure F. Mr. Burr contends that regardless of what the Department calls the continued restrictions allegedly imposed under Policy No. 20.1, they constitute punishment.

Mr. Burr further contends that the court need not reach the aforementioned issue because it is sufficient that the Department "expunged" the discipline from Mr. Burr's record, but continues to impose the aforementioned restrictions. If the event was expunged, and thus never happened, there is no basis for the Department's continued imposition of restrictions.

Respondents reply that the continued restrictions are permissible because 34-A M.R.S. § 3032 only requires that documentation of a disciplinary complaint be expunged if the prisoner is found not guilty or the complaint is otherwise withdrawn. Respondents contend Mr. Burr's argument that when the Department expunges a disciplinary complaint it is required to treat the incident as if it never happened represents a "somewhat naïve view of the necessities of prison management." Accordingly, the

6

Department contends the restrictions are warranted and supported by Department Policy No. 20.1.

The Law Court has stated that courts "should decline to decide issues which by virtue of valid and recognizable supervening circumstances have lost their controversial vitality." *Eastern Maine Medical Center v. Maine Health Care Fin. Comm'n.*, 601 A.2d 99, 101 (Me. 1992) (quotation omitted). "An issue is deemed to be 'moot' when there is no 'real and substantial controversy, admitting of specific relief through a judgment of conclusive character.'" *Anthem Health Plans of Maine, Inc. v. Superintendent of Ins.*, 2011 ME 48, ¶ 4, 18 A.3d 824 (quotation omitted). "When determining whether a case is moot, [the court] examine[s] whether there remain sufficient potential effects flowing from resolution of the litigation to justify application of the court's limited resources." *Id.* (quotation omitted).

The relief available to Mr. Burr in the present matter is governed by the Administrative Procedures Act, which provides that the court may affirm an agency's decision, remand the case for further proceedings, or reverse or modify the decision upon certain enumerated grounds. 5 M.R.S.A. § 1107(4).

Here, the determination of whether Mr. Burr's Petition is moot turns on whether he could be entitled to relief beyond that already granted by Respondents. In particular, the court must assume the allegations in Mr. Burr's Petition are true, view those allegations in the light most favorable to Mr. Burr, and determine whether the court could order Mr. Burr be removed from SMU and have his visitations with his wife reinstated. Stated differently, the court must decide whether the Department can continue to impose

7

the aforementioned restrictions on Mr. Burr pursuant to Policy No. 20.1.[4] For the reasons discussed below, the court finds that the Petition is not moot.

As Respondents point out, Policy No. 20.1 grants the authority to change a prisoner's custody level, housing status, or take other action—regardless of the outcome of the discipline process—if it is in the interest of the prisoner, the prison population, or in the interest of safety, security, or orderly management of the facility. Under this broad grant of discretion and authority, the Department can transfer Mr. Burr to SMU and cut off his visits with his wife if it is for one of the interests listed in Policy No. 20.1. While counsel for Respondents stated at oral argument that ending Mr. Burr's visits with his wife and placement in the SMU were carried out in the interest of safety, Respondents have failed to point to any conduct on the part of the Petitioner which justifies the continuing restrictions pursuant to Policy No. 20.1. While such a justification could emerge after factual development, the Court is not persuaded that Policy No. 20.1 on its face authorizes the Respondents to indefinitely place Mr. Burr in the SMU. Therefore, depending on factual development, the Court could have the authority to reverse the Department's actions.[5]

Further, the court is not convinced that even if Respondents presented evidence demonstrating their rationale for imposing the restrictions on Mr. Burr that this, alone, would moot Mr. Burr's Petition. This is because Policy No. 20.1 conceives of

---

[4] At the hearing, counsel for Respondents went so far as to assert that Mr. Burr could be held in the SMU indefinitely, for no reason.

[5] Although not necessary for the disposition of this motion, the court agrees with respondents that 34-A M.R.S.A. § 3032(6)(I) simply requires that "all documentation relating to the complaint must be expunged" if the prisoner is "cleared of the charges in a complaint, or the complaint is withdrawn." The statute does not speak to its impact on any restrictions imposed prior to the resolution of the complaint.

8

disciplinary sanctions, including disciplinary segregation, as having limits. *See* 03-201

C.M.R. ch. 20, § 20.1, Procedure D. In particular, Policy No. 20.1 explains that

> The purpose of this section is to define and grade violations in order to limit official discretion and to give fair warning to the prisoner of what conduct is prohibited and what the possible consequences of disciplinary violations are. It is also the purpose of this section to prescribe punishments that are proportionate to the seriousness of the violation.

*Id.* at § 20.1, Procedure D(1). Policy No. 20.1 goes on to list the four classes of punishments that may be imposed upon a finding that a prisoner committed a disciplinary violation. *Id.* at § 20.1, Procedure D(8). The most serious of the classes carries with it a punishment of "[d]isciplinary segregation or disciplinary restriction or both, up to a total of thirty (30) days" and "[l]oss of privileges for no more than thirty (30) days." *Id.*[6] In light of the limitations imposed on discipline when a prisoner is found to have committed a disciplinary violation, it is debatable, certainly at this stage of the litigation and on this record, that Procedure F in Policy No. 20.1 was intended to go beyond those limitations when no violation is found. This interpretation is further supported by additional, detailed Department policies governing the placement of prisoner's in administrative segregation and/or protective custody. These policies suggest that placement in the SMU is a tightly regulated decision that cannot continue indefinitely based on an expunged disciplinary violation.

In particular, Policy No. 15.1 provides that a prisoner may be placed on administrative segregation if he or she meets one of four criteria:

a. The prisoner constitutes an escape risk in a less restrictive status;

---

[6] Policy No. 20.1 does admit the possibility of disciplinary segregation lasting longer than 30 days, but that is only if the prisoner is found guilty of more than one charge and the punishments are applied consecutively. *Id.* at § 20.1, Procedure D(3).

9

b. The prisoner may pose a threat to the safety of others if in a less restrictive status;

c. The prisoner may pose a threat to his/her own safety if in a less restrictive status; or

d. There may be a threat to the safety of the prisoner if in a less restrictive status.

03-201 C.M.R. ch. 15, § 15.1. Procedure A(1), Procedure C(3). In addition to meeting one of the aforementioned criteria, Policy No. 15.1 lays out a number of requirements that must be met in connection with placing a prisoner on administrative segregation. These requirements include providing the prisoner with copies of the relevant paperwork supporting the prisoner's placement—and continued retention—in administrative segregation. *Id.* at § 15.1, Procedure C(5), (11), (12), (14).

Similarly, Policy No. 15.3 provides that an individual may be placed in protective custody based on:

a. Reports indicating the prisoner has been assaulted or that there is a substantial risk of the prisoner being assaulted;

b. Reports indicating that the prisoner has been threatened or harassed;

c. Reports indicating the prisoner is perceived as an informant or trial witness;

d. The circumstances of the prisoner's crime indicate that there is a substantial risk of the prisoner being threatened or harassed;

e. Reports indicating the prisoner has been or that there is a substantial risk of the prisoner being the victim of sexual assault or sexual harassment;

f. The prisoner's profile indicates that there is a substantial risk of the prisoner being victimized due to his/her chronological age or due to the prisoner's mental, psychological, social or physical level of functioning or characteristics.

03-201 C.M.R. ch. 15 § 15.3, Procedure A(4). The rationale for placing a prisoner in protective custody must be documented during the shift in which the placement occurs and, if the prisoner has not been removed from protective custody status, "the staff member who approved the placement shall ensure that the prisoner is served within seventy-two (72) hours of placement with written notification of the reasons for

10

placement and the date and time of the initial protective custody status review." *Id.* at §

15.3, Procedure A(5), (8). Furthermore, at a review of the prisoner's placement in

protective custody by the prisoner's Unit Management, the rationale for placing the

prisoner in protective custody must be read to him or her and the prisoner must be

provided a copy of the Protective Custody Status Review Minutes form generated at the

Unit Management team's review. *Id.* at § 15.3, Procedure A(13), (14), (17). If a decision

placing the prisoner in protective custody status becomes final, the prisoner must be

advised that he or she will remain on protective custody status unless the Chief

Administrative Officer, or designee, decides to remove the prisoner from such status. *Id.*

at § 15.3, Procedure A(18).

As noted above, Respondents cannot point to anything in the pleadings or

otherwise that suggests that the above-described procedures were followed or even

attempted. The Court therefore concludes that it could, depending on factual

development, find that Petitioner is entitled to relief beyond what has already been

afforded him by the Respondents, and that his claim under Count I is therefore not moot.

Furthermore, as discussed in section B, *infra*, the Petition is not moot because Mr. Burr

has made allegations, which taken as true, are sufficient to state a claim for relief for

violation of his rights to due process under 42 U.S.C. §1983.

B. <u>Whether Count II Alleges a Violation of Mr. Burr's Due Process Rights</u>

Respondents contend that the disciplinary proceedings and sanctions imposed on

Mr. Burr in this case do not implicate the protections of the Due Process Clause under

*Sandin v. Conner*, 515 U.S. 472, 487 (1995) and, accordingly, fail to state a claim upon

which relief can be granted pursuant to 42 U.S.C. § 1983. In support, Respondents point

11

to case law holding that state statutes and correctional regulations providing for notice and an opportunity to be heard in a disciplinary proceeding do not in themselves create a constitutional right in a 42 U.S.C. § 1983 action and that violation of a state law, even where arbitrary, capricious, or undertaken in bad faith does not in itself give rise to a denial of substantive due process under the Constitution.

Mr. Burr responds that *Sandin* acknowledges that solitary confinement for punitive purposes is a type of atypical, significant deprivation that triggers the Due Process Clause. Accordingly, Mr. Burr contends his confinement in the SMU implicates a liberty interest invoking the Due Process Clause and the Department's failure to comply with the mandatory prescriptions of Policy No. 20.1 deprived Mr. Burr of that interest. In addition, Mr. Burr asserts there is a significant question as to whether the extended length of his solitary confinement violates the Eighth Amendment prohibition on cruel and unusual punishment.

Respondents reply that Mr. Burr selectively cites to *Sandin*, which when read in its entirety does not acknowledge that solitary confinement for punitive purposes is a type of atypical, significant deprivation implicating a constitutional liberty interest. Indeed, in *Sandin* itself, the Supreme Court held that the prisoner's disciplinary placement in segregation in that case did not present the type of atypical, significant deprivation in which a State might create a liberty interest. *Sandin*, 515 U.S. at 485-86. Respondents also argue that a prison does not necessarily create a protected liberty interest when it adopts a mandatory policy. *Id.* at 483-84 (citations omitted).

Respondents further claim that the Supreme Court has recognized the authority of prison officials to place inmates in segregated confinement for administrative rather than

punitive reasons citing *Hewitt v. Helms*, 459 U.S. 460, 468 (1983) and *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 461 (1989)). Accordingly, Respondents contend that the Department's continued placement of Mr. Burr in the SMU and prohibition of visits from his wife do not violate his rights under the Due Process Clause and his claim under 42 U.S.C. § 1983 should be dismissed.

42 U.S.C. § 1983 provides, in pertinent part, that every person who, under color of statute, ordinance or regulation, causes any other person to suffer a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the injured party" in a lawsuit. One of the rights protected under section 1983 is the right to Due Process. The "Due Process Clause protects persons against deprivations of life, liberty or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). A liberty interest may arise from the Constitution itself, or it may arise from an expectation or interest created by state laws or policies. *Id.*

Prior to 1995, the existence and scope of an inmate's liberty interest, and therefore whether there was a due process violation, was determined by the language of the applicable regulations. *E.g. Matthews v. Wiley*, 744 F.Supp.2d 1159, 1171 (D. Colo. 2010). However, in *Sandin*, the United States Supreme Court held that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions, but whether the conditions "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484. In other words, an inmate asserting a Due Process claim based on restrictive conditions of

13

confinement must show that the conditions constitute an "atypical and significant hardship" when compared to the ordinary incidents of prison life.

In *Sandin*, the prisoner was refused the ability to present witnesses during a disciplinary hearing and then sentenced to 30 days disciplinary segregation for his misconduct despite a regulation that instructed the committee to find guilt when a misconduct charge is supported by substantial evidence. 515 U.S. at 475-76. Applying the above-mentioned inquiry, *Sandin* determined that the prisoner's "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id.* at 486. The Court explained that this was due in part to the fact that disciplinary segregation mirrored the conditions imposed on inmates in administrative segregation and protective custody. *Id.* The Court also found it noteworthy that the State expunged the prisoner's disciplinary record regarding the "high misconduct" charge nine months after the prisoner served his 30 days in segregation. *Id.* Thus, the Court found that the prisoner's confinement "did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction." *Id.* "Indeed, the conditions [at the prison] involve significant amounts of 'lockdown time' even for inmates in the general population" and as a result, the state's actions "in placing [the prisoner] there for 30 days did not work a major disruption in his environment." *Id.; see also Hewitt v. Helms*, 459 U.S. 460, 468 (1983) ("It is plain that transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence"). The Court also found some comfort in the fact that the prisoner "requested that he be placed in protective custody after he had been released from disciplinary

14

segregation" and that his "expectations have at times reflected a personal preference for the quietude of the [solitary confinement]." *Id.* at 486 n. 9.

In *Wilkinson*, the Supreme Court noted that courts have had a difficult time locating the appropriate baseline from which to measure what constitutes an atypical and significant hardship in a prison system under *Sandin*. 545 U.S. at 223. *Wilkinson* did not, however, resolve that issue because it found that assignment to the Ohio Supermax facility, known as the Ohio State Penitentiary ("OSP"), imposed an atypical and significant hardship under any plausible baseline. *Id.* at 223. This was because:

> For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin*, placement at OSP is indefinite and, after an initial 30-day review, s reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP.

*Id.* at 223-24 (internal citations omitted).

Here, Mr. Burr has adequately alleged a violation of his Due Process rights regarding his continued confinement in the SMU. First, Mr. Burr has adequately alleged a liberty interest by asserting that he has been—and continues to be—held in solitary confinement since June 12, 2014.[7] The Petition categorizes Mr. Burr's placement in the SMU as equivalent to solitary confinement, but does not provide any additional details

---

[7] As noted, Respondents acknowledged at the hearing that Mr. Burr remains in the SMU and asserted that they could retain Mr. Burr in the SMU indefinitely.

15

regarding the conditions in the SMU. Department Policy Numbers 15.1 and 15.2, however, help to fill in this blank by setting forth certain conditions governing prisoners placed in administrative and disciplinary segregation. For example, similar to *Wilkinson*, the policies provide that prisoners are permitted out-of-cell exercise for only "one (1) hour per day, five (5) days per week, outdoor weather permitting, unless security or safety considerations dictate otherwise." 03-201 C.M.R. ch. 15, §§ 15.1, Procedure E(2)(i); 15.2. Procedure D(1)(i). In addition, prisoners are limited to one telephone call per week and one non-contact visit per week. *Id.* at §§ 15.1, Procedure E(2)(b), (c); 15.2, Procedure D(1)(b), (c). Unlike *Wilkinson*, and similar to *Sandin*, however, the policies provide that prisoners' living conditions in segregation shall "approximate those of general population prisoners regarding cell size, lighting, heat, and ventilation." *Id.* at §§ 15.1, Procedure E(2); 15.2, Procedure D(1). While the conditions in the SMU may not be as harsh as those in *Wilkinson*, this does not mean they do not give rise to a liberty interest because the conditions in *Wilkinson* imposed "an atypical and significant hardship under any plausible baseline." 545 U.S. at 223. In other words, *Wilkinson* does not represent a minimum standard that must be met or exceeded in order to establish an atypical and significant hardship. Instead, it represented a clear-cut case of an atypical and significant hardship. Accordingly, when the evidence is viewed in the light most favorable to Mr. Burr and all reasonable inferences are drawn in his favor, the court is satisfied that Mr. Burr's case has adequately alleged conditions which could, under *Wilkinson*, constitute an atypical and significant hardship within the correctional context. As the Supreme Court explained in *Wilkinson*, the allegedly harsh conditions of the SMU "may well be necessary and appropriate in light of the danger that [Mr. Burr] .

pose[s]....That necessity, however, does not diminish our conclusion that the conditions give rise to a liberty interest in their avoidance." 545 U.S. at 224.

Second, although not explicitly challenged by Respondents, the Petition has sufficiently alleged that the aforementioned liberty interest was deprived without sufficient process. In particular, the Petition alleges numerous violations of Policy No. 20.1 by the Respondents. For example, Mr. Burr alleges he did not have an opportunity to review and contest the alleged evidence against him and that information in the disciplinary report used against him was fabricated. Petition, ¶¶ 14-23, 28-33. Finally, as noted previously, Respondents have not articulated any reason or explanation as to why Mr. Burr continues to be held in the SMU in the wake of its decision to reverse and expunge the disciplinary proceedings against him.

Accordingly, the allegations in Count II of Mr. Burr's Petition and Complaint, taken in the light most favorable to Mr. Burr, adequately allege a constitutional claim against the Respondents under 42 U.S.C. § 1983, and are sufficient to survive Respondents' motion to dismiss.

The entry will be: Respondents' Motion to Dismiss Counts I and II is DENIED.

Pursuant to M.R. Civ. P. 79(a), the Clerk is directed to incorporate this Order by reference in the docket.

Dated: March 23, 2015

M. Michaela Murphy, Justice
Maine Superior Court.

17

Action:  Petition for Review                    **J. Murphy**
             80C


Douglas Burr                        vs.        Rodney Bouffard, et al.

---

Plaintiff's Attorney                           Defendant's Attorney

Eric Mehnert, Esq.                             James Fortin, AAG
PO Box 458                                     6 State House Station
Orono, ME 0473                                 Augusta, ME  04333-0006

Date of Entry

---

| | |
|---|---|
| 9/9/14 | Petition for Review of Final Agency Action, filed (9/4/14). s/Mehnert, Esq. |
| 11/25/14 | Motion to Dismiss, filed 11/25/14.  s/Fortin, AAG |
| 12/19/14 | Motion to Extend Time to File Plaintiff's Response to Defendants' Motion to Dismiss, filed.  s/Mehnert, Esq. |
| 1/7/15 | ORDER, Murphy, J.  (12/31/14) (re: Motion to Extend Time filed 12/19/14) Granted.  Plaintiff's response to Motion to Dismiss due 1/2/15. Copy to Atty Mehnert and AAG Fortin |
| 1/715 | Petitioner's Response to Respondents' Motion to Dismiss, filed 1/5/15.  s/Mehnert, Esq. |
| 1/9/15 | Hearing on Motion to Dismiss scheduled for 2/3/15 at 1:00 p.m. Notice of Hearing sent to Atty Mehnert and AAG Fortin |
| 1/14/15 | Reply to Response to Motion to Dismiss filed 1/12/15.  s/Fortin, AAG |
| 2/3/15 | Hearing held, J. Murphy presiding.  Eric Mehnert, Esq. and James Fortin, AAG Tape 2000, Index 4711-6490 Under advisement. |
| 3/24/15 | ORDER, Murphy, J. (3/23/15) Respondent's Motion to Dismiss counts I and II is DENIED. Copy to Atty Mehnert and AAG Fortin |
| 3/31/15 | Copy to repositories. |