MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2024 ME 74
Docket:        WCB-23-313
Argued:        April 11, 2024
Decided:       October 1, 2024
Revised:       November 5, 2024

Panel:         STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

## STEVE L. MICHAUD

v.

## CARIBOU FORD-MERCURY, INC., et al.

LAWRENCE, J.

[¶1]   Steve L. Michaud appeals from a decision of the Workers' Compensation Board (WCB) Appellate Division affirming the decision of an Administrative Law Judge (*Pelletier, ALJ*) holding that interest on Michaud's specific-loss benefits for a work-related eye injury sustained in 2014 did not begin to accrue until 2021, when Michaud's recovery of vision from the injury reached maximum medical improvement and the benefit became due.  The record conclusively establishes, however, that there was no material improvement in Michaud's vision after the date of injury, and therefore the benefit became due when the injury occurred.  We therefore vacate the Appellate Division's decision and remand the matter for entry of a decree

2

ordering Michaud's employer, Caribou Ford-Mercury, Inc.,[1] to pay interest on Michaud's specific-loss benefits accruing from the date of his injury.

## I. BACKGROUND

[¶2]  The following facts, which are drawn from the procedural record, the ALJ's findings, and the parties' agreed-to statement of facts, are supported by the record.  *See* 39-A M.R.S. § 318 (2024); *Huff v. Reg'l Transp. Program*, 2017 ME 229, ¶ 2, 175 A.3d 98.

[¶3]  On December 26, 2014, Michaud sustained a traumatic injury to his left eye while working as an auto mechanic.  The injury immediately resulted in a loss of more than eighty percent of vision in that eye.  Between the date of the injury and September 8, 2019, Caribou intermittently paid incapacity benefits to Michaud.  During that same period, Michaud received regular treatment, including multiple surgeries, for his injury with the goal of improving his vision. The surgeries included removal of a vitreous hemorrhage on February 18, 2015, an intra-ocular lens implant and a corneal transplant on August 24, 2015, and a second corneal transplant on August 12, 2019, after the first proved ineffective.

---

[1]  Caribou Ford-Mercury, Inc., also does business as Griffeth Ford.  The other named party is the Maine Auto Dealers' Association Workers' Compensation Trust.

[¶4]   In September 2021, Michaud filed petitions for an award of compensation and for specific-loss benefits.[2]  Shortly thereafter, on October 14, 2021, a doctor issued a report stating that the doctor had reviewed Michaud's medical records and Michaud "seem[ed] to be at a point of maximum medical improvement."[3]  The doctor's report summarized Michaud's treatment history, including various reported improvements in his sight in his left eye over the course of treatment, and concluded that Michaud had suffered, as of the date of the report, a ninety-four percent loss of vision in his left eye.

[¶5]   On March 10, 2022, the parties participated in mediation on Michaud's petitions, resulting in a partial agreement that Michaud is entitled to 162 weeks of specific-loss benefits for the loss of more than eighty percent of vision in his left eye.  *See* 39-A M.R.S. § 212(3)(M) (2024).  The parties further agreed that Caribou would receive a credit for the intermittent payments that it had voluntarily made to Michaud between the date of his injury and

---

[2]  Pursuant to 39 M.R.S. § 213, "specific loss benefits" arise from work-related injuries that cause the actual loss of certain body parts or bodily functions, for which the injured employee is deemed to be incapacitated for the period listed in the schedule contained in section 213(3) and due compensation based on a calculation from the date of injury, subject to the maximum benefit set in section 211.

[3]  "Maximum medical improvement (MMI)" is "the date after which further recovery and further restoration of function can no longer be reasonably anticipated, based upon reasonable medical probability."  39-A M.R.S. § 102(15) (2024).  An injured employee must reach MMI before he can receive partial incapacity benefits, *id.* § 102(16); 39-A M.R.S. § 213 (2024), which are not at issue in this case.

September 8, 2019. The agreed-upon benefit amount was $59,905.33, which Caribou paid to Michaud on March 22, 2022.

[¶6] Mediation did not resolve, however, the issue of when Michaud became entitled to specific-loss benefits or, by extension, the amount of interest owed on Michaud's specific-loss benefits. *See* 39-A M.R.S. § 205(6) (2024). The parties therefore referred Michaud's petition for specific-loss benefits to an ALJ to determine the interest due on the award. *See* 39-A M.R.S. § 315 (2024). In lieu of a hearing, the parties stipulated facts to the ALJ, *see id.* § 318, establishing, inter alia, that Michaud "sustained more than [eighty percent] vision loss at the time of his initial injury" and that the doctor's October 14, 2021, report determining that Michaud's final vision loss was ninety-four percent was "the first time there was an assessment of a numerical percentage of vision loss with respect to the injury."

[¶7] On December 1, 2022, the ALJ entered a decree stating that "[u]ntil surgical intervention aimed at restoring vision had occurred and progress could be assessed, the degree of permanent loss could not be determined." Because the doctor reported on October 14, 2021, that Michaud had reached MMI, the ALJ concluded that Michaud's specific-loss benefits became due on that date. Interest was therefore owed on the award from that date to the date

that the benefits were paid, March 22, 2022.  *See id.* § 205(6).  Michaud moved for further findings of fact and conclusions of law, *id.* § 318, arguing that his actual loss of eighty percent of the vision in his left eye occurred on the date of his injury and interest was therefore owed as of that date.  The ALJ denied the motion.

[¶8]  Michaud then appealed the ALJ's decree to the Appellate Division, *see* 39-A M.R.S. § 321-B (2024), arguing that the ALJ erred by concluding that, although Michaud's injury immediately resulted in more than eighty percent vision loss in his left eye and medical intervention had been unsuccessful, Michaud's specific-loss benefits became due only after his doctor reported that he had reached MMI.  Relying on our decision in *Tracy v. Hershey Creamery Co.,*1998 ME 247, 720 A.2d 579, the only case in which we have dealt with a claim for specific-loss benefits arising from a work-related eye injury, the Appellate Division (*Chabot, ALJ*) affirmed the ALJ's decree.  Michaud petitioned for review, and on December 8, 2023, we granted his petition.  *See* 39-A M.R.S. § 322(1), (3) (2024); M.R. App. P. 23.

## II.  DISCUSSION

[¶9]  Michaud makes two arguments as to why the Appellate Division erred by affirming the ALJ's decree.  First, he contends that his specific-loss

6

benefits became due not on the date that his doctor reported that he had reached MMI and had sustained a post-treatment vision loss of ninety-four percent, but on the date of his injury. He argues that although, pursuant to our decision in *Tracy*, the determination of whether an employee qualifies for specific-loss benefits for loss of an eye[4] cannot be made until the injury has reached its reasonable medical endpoint, when the employee's vision loss remains above the eighty percent loss threshold from the time of injury, the benefit is due on the date of the injury. Caribou argues that *Tracy* dictates that specific-loss benefits for the loss of an eye are not due until an employee's eye injury has reached its reasonable medical endpoint, the employer receives notice that the injury is at its endpoint, and the employee's vision loss at that point exceeds the statutory eighty percent loss threshold.

[¶10] Second, Michaud argues that the Appellate Division could not affirm the ALJ's decree because the ALJ effectively allowed Caribou to credit its voluntary incapacity payments made before Michaud was entitled to specific-loss benefits pursuant to the decree, despite a prohibition on offsets

---

[4] For the purposes of the specific-loss benefits provision of the Worker's Compensation Act, an eighty present loss of vision in one eye constitutes the loss of that eye. 39-A M.R.S. § 212(3)(M) (2024)

from specific-loss benefits for payments made before specific-loss benefits become due.

[¶11] For the reasons explained below, we agree with Michaud that his specific-loss benefits became due on the date of his injury, December 26, 2014, and note that the settlement agreement governed whether Caribou was entitled to offset the award of specific-loss benefits with the voluntary incapacity benefits it had paid to Michaud.

## A. Standard of Review and Statutory Framework

[¶12] We review decisions of the Appellate Division "according to established principles of administrative law, except with regard to the . . . ALJ's factual findings," *Bailey v. City of Lewiston*, 2017 ME 160, ¶ 9, 168 A.3d 762, which are final in the absence of fraud, 39-A M.R.S. § 318. We "afford appropriate deference to the Appellate Division's reasonable interpretation of the workers' compensation statute and will uphold the Appellate Division's interpretation unless the plain language of the statute and its legislative history compel a contrary result." *Bailey*, 2017 ME 160, ¶ 9, 168 A.3d 762 (citation and quotation marks omitted). In interpreting the Workers' Compensation Act, we "look to the plain meaning of the statutory language, and construe that language to avoid absurd, illogical, or inconsistent results." *Freeman v. NewPage Corp.*,

2016 ME 45, ¶ 5, 135 A.3d 340 (quotation marks omitted).  The Act must be construed neutrally so as not to favor either the employee or the employer. *Marsella v. Bath Iron Works Corp.*, 585 A.2d 802, 804 & n.5 (Me. 1991); *see also* 39-A M.R.S. § 153(3) (2024).

[¶13] Although we afford appropriate deference to the Appellate Division's reasonable interpretation of the workers' compensation statute, when the ultimate issue is the proper interpretation of judicial precedent, we are not obligated to defer to the Appellate Division's interpretation of that precedent.  *See NLRB. v. U.S. Postal Serv.*, 660 F.3d 65, 68 (1st Cir. 2011) (explaining that an appellate court is not compelled to defer to an agency's interpretation of judicial precedent); *cf. Van Houten v. Harco Const., Inc.*, 655 A.2d 331, 333 (Me. 1995) (reviewing de novo WCB's determination that a party was not collaterally estopped from raising an issue because the question of collateral estoppel did not "involve an interpretation of the [Workers' Compensation] Act" or "fall within the [WCB's] traditional area of expertise"). Accordingly, we interpret judicial precedent de novo.  *See Me. Pub. Serv. Co. v. Fed. Power Comm'n*, 579 F.2d 659, 665 (1st Cir. 1978) (stating that a court "may pass judgment independently" of an agency's interpretation of judicial precedent); *cf. Bates v. Dep't of Behav. & Developmental Servs.*, 2004 ME 154,

¶ 38, 863 A.2d 890 ("The trial court's interpretation of its own judgment will be reviewed de novo on questions of law . . . .").

[¶14]  Specific-loss benefits are a species of total-incapacity benefits that compensate injured employees for "actual loss" of a body part.  39-A M.R.S. § 212(3).  For specific losses, "the incapacity is considered to continue for the period specified" in the statutory schedule of benefits.  *Id.*  Specific-loss benefits are available for an employee who suffers "total loss" of an eye, which is defined as an "[e]ighty percent loss of vision of one eye."  *Id.* § 212(3)(M).  Under the statutory schedule, an employee who has lost at least eighty percent vision in one eye due to a workplace injury is entitled to 162 weeks of compensation.  *Id.*

[¶15]  For most injuries included in the schedule, "actual loss" has been construed as "amputation" of the body part.  *E.g.*, *Gibbs v. Fraser Paper, Ltd.*, 1997 ME 225, ¶¶ 6-7, 703 A.2d 1256 (distinguishing between "physical loss" and "loss of function" of a finger and concluding that section 212(3) generally requires amputation of the member); *see also* 39-A M.R.S. § 212(3)(A)-(L). Thus, in *Scott v. Fraser Papers, Inc.*, 2013 ME 32, ¶¶ 11, 13, 65 A.3d 1191, we explained that an employee who suffered a work-related injury to his hand was not entitled to specific-loss benefits for loss of a finger until several months

after the injury, when his condition had deteriorated and his finger had to be amputated.

[¶16]  Because the loss of an eye is defined by statute as the loss of a certain percentage of vision in the eye, as opposed to the "physical loss" of the eye, it is more difficult to assess whether an employee has suffered an eye injury that qualifies for specific-loss benefits than to assess whether injuries to other body parts entitle an employee to specific-loss benefits.  We have addressed specific-loss benefits in regard to an injury of an eye only once, in *Tracy*. Whether that decision prescribes the outcome of Michaud's appeal is the central issue before us.

B.     **Applicability of *Tracy v. Hershey Creamery Co.***

[¶17]  In *Tracy*, we held that "the determination as to whether an employee's loss of vision exceeds [eighty percent] for purposes of [section] 212(3)(M) should be made when the work-related condition has reached a reasonable medical endpoint."  1998 ME 247, ¶ 9, 720 A.2d 579.  In reaching this conclusion, we recognized that specific-loss benefits, under the former Workers' Compensation Act,[5] were "intended as compensation for permanent

---

[5]  The Workers' Compensation Act was repealed and replaced in its entirety in 1992.  P.L. 1991, ch. 885, §§ A-7, -8, -11 (effective Jan. 1, 1993) (codified as amended at 39-A M.R.S. §§ 101-909 (2024)).

impairment" and that the determination of permanent vision loss "was made at the point of maximum medical improvement." *Id.* ¶ 8 (quotation marks omitted). We observed that even though the current section 212(3), governing specific-loss benefits, contains no reference to MMI, it does contain "similar concepts" to permanent-impairment benefits—which are determined by reference to MMI—"expressed by use of the term[] . . . 'actual loss.'" *Id.* ¶ 9. We grafted the MMI concept onto the specific-loss provision for loss of an eye for the limited purpose of ensuring that specific-loss benefits were not awarded to employees whose vision loss was merely temporary and could be restored to a point below the statutory threshold through reasonable medical intervention. *Id.* ¶ 12 (recognizing that permitting compensation for specific-loss benefits for only temporary injuries "would be directly contrary to the Legislature's intent to allow specific-loss benefits only in instances of a total, catastrophic loss").

[¶18] Avoiding the award of specific-loss benefits when an employee's vision loss can be restored to a point below the statutory threshold by reasonable medical intervention comports with the Workers' Compensation Act. Were we to overrule *Tracy*'s requirement that the determination of whether an employee qualifies for specific-loss benefits be made only after medical efforts to restore vision, we would necessarily disregard the legislative

mandate to construe the Workers' Compensation Act neutrally. 39-A M.R.S. § 153(3). We also would, effectively, open the door to awarding the specific-loss benefit to any employee who suffers an eye injury that causes an immediate eighty percent vision loss, even if medical intervention could restore the employee's vision loss to a point below that statutory benefit threshold. This would impermissibly favor employees, place a burden on employers to compensate injuries that do not amount to the "total loss" of an eye, and conflict with the statutory language of section 212(3)(M) that loss of an eye is considered to continue for 162 weeks. *See id.* §§ 153(3), 212(3)(M); *Freeman*, 2016 ME 45, ¶ 5, 135 A.3d 340.

[¶19] Thus, the determination of whether Michaud qualified for specific-loss benefits could be made only after his eye injury had reached its reasonable medical endpoint. Because his doctor did not determine that he had reached MMI until October 14, 2021,[6] his entitlement to specific-loss benefits could not be decided until that date.

---

[6] For purposes of this appeal, we consider the doctor's report that Michaud had reached MMI as of the date of the report as a determination that his injury was at a reasonable medical endpoint as of the same date. In other cases, however, those dates may not be the same. MMI "is a prediction that an employee's condition will not improve." *Williams v. E.S. Boulos Co.*, 2000 ME 40, ¶ 9, 747 A.2d 181. It is essential to the calculation of partial incapacity benefits because it signifies the date on which an employee's ongoing impairment is permanent, rather than temporary. *See* 39-A M.R.S. § 102(16) (defining "permanent impairment" as "any anatomic or functional abnormality or loss

[¶20]  Contrary to the Appellate Division's conclusion, *Tracy* is not dispositive here.  In *Tracy*, the employee's vision was significantly restored through medical intervention such that at the eye injury's reasonable medical endpoint, the employee had only a sixty to seventy percent vision loss.  1998 ME 247, ¶ 2, 720 A.2d 579.  Therefore, the employee in *Tracy* did not qualify for specific-loss benefits.  *Id.* ¶ 12.  By contrast, Michaud's injury immediately resulted in more than eighty percent loss of vision in his left eye, but as of the injury's reasonable medical endpoint, he had a ninety-four percent vision loss in his left eye—well above the threshold for specific-loss benefits.  *Tracy* does not address when specific-loss benefits become due under these circumstances.

---

existing after the date of [MMI] that results from the injury"); *id.* § 213; *Bailey v. City of Lewiston*, 2017 ME 160, ¶ 15, 168 A.3d 762.

In the specific-loss-benefit context, MMI has limited significance, because specific-loss benefits do not depend on whether the employee's loss of vision will be restored *at all*, but whether the employee's vision will be restored *to a point below an eighty percent loss*.  39-A M.R.S. § 212(3)(M) (2024).  So, although an eye injury will always have reached its reasonable medical endpoint if it has also reached MMI, the converse is not necessarily true.  Rather, the reasonable medical endpoint for the specific loss of an eye is the time at which an eye injury can no longer reasonably be anticipated to improve to less than an eighty percent loss.  That may occur before MMI if, for instance, the employee immediately loses ninety-five percent of his vision and treatment can reasonably be anticipated to restore vision to a ninety percent loss but not to a seventy-nine percent loss.  As the WCB has noted, *Tracy* recognized overlap in the concepts of MMI and entitlement to specific-loss benefits, but it does not require an employee to prove he has reached MMI to qualify for specific-loss benefits.  *See Robinson v. Goodall Landscaping, Inc.*, W.C.B. No. 11002357, at 1-2 (Me. 2018).

## C.    When Michaud's Benefits Became Due

[¶21]  The date that an employee's specific-loss benefits become due for loss of an eye, and from which interest accrues, when reasonable medical treatment does not adequately restore vision is an issue of first impression. Under the Workers' Compensation Act, "[w]hen weekly compensation is paid pursuant to an award, interest on the compensation must be paid at the rate of 10% per annum from the date each payment was due, until paid."  39-A M.R.S. § 205(6); *see also Guiggey v. Great N. Paper, Inc.*, 1997 ME 232, ¶ 10, 704 A.2d 375.  Specific-loss benefits are "due and payable within 14 days after the employer has notice or knowledge of the injury."  39-A M.R.S. § 205(2).  An "injury" for specific loss of an eye is one that results in "total loss" of the eye, which is defined as an eighty percent loss of vision in that eye.  39-A M.R.S. § 212(3)(M).

[¶22]   Although, pursuant to *Tracy*, an eye injury must undergo reasonable medical treatment before it can be determined whether an employee qualifies at all for specific-loss benefits, it does not follow that the date that the reasonable medical endpoint is confirmed is the date that benefits become due, as the ALJ (*Pelletier, ALJ*) concluded here.  That date has no bearing on when the employee in fact suffered an injury constituting the actual loss of

an eye. *See Bailey*, 2017 ME 160, ¶ 9, 168 A.3d 762 (recognizing arbitrary decision-making as a basis for rejecting a decision of the WCB). Rather, when an employee's vision at the reasonable medical endpoint still exceeds the statutory loss threshold, the date that specific-loss benefits became due is retrospective, potentially to the date of injury. Evaluators must look backward to determine when the eye injury damaged the employee's vision to the threshold of eighty percent vision loss, whether treatment later restored the employee's vision, and the extent of any restoration.

[¶23] Michaud's injury occurred on December 26, 2014. Caribou was aware of his injury on that date and began paying Michaud incapacity benefits effective the following day. There is no dispute that the injury immediately resulted in more than eighty percent vision loss in Michaud's left eye. There is also no dispute that extensive surgical intervention failed to restore his vision, and, at the reasonable medical endpoint of his treatment, Michaud's condition had further deteriorated to a ninety-four percent vision loss. Although Michaud reported, and visual acuity tests reflected, improvements in his vision at various times during his treatment, nothing in the record suggests that his vision loss was restored to a point below the threshold of an eighty percent vision loss or could reasonably have been anticipated to do so. Nor does the

record contain any documented assessment or estimate of a numerical percentage of Michaud's vision loss during his treatment. Considering these facts, and looking backward from the reasonable medical endpoint, Michaud suffered actual loss of his left eye on the date of his injury, December 26, 2014, and there was never an assessment that his vision loss was restored to a point below the eighty percent threshold after that. Thus, Michaud became entitled to specific-loss benefits on the date of his injury, and Caribou owes interest on the award of specific-loss benefits accruing from that date until March 22, 2022, when Caribou paid the benefit . *See* 39-A M.R.S. §§ 205(2), (6), 212(3)(M).

[¶24] Caribou contends that this conclusion is untenable because, until the doctor's report on October 14, 2021, it lacked notice that Michaud's injury gave rise to an obligation to pay specific-loss benefits. It cites our decision in *Carroll v. Gates Formed Fibre Prods.*, 663 A.2d 23, 25 (Me. 1995), to support this argument. In that case, we held that "although the employee may not be required to give affirmative notice of a claim in all cases, the employer must have some knowledge, either from the employee or from the circumstances of the injury, that it has an obligation to pay incapacity benefits before it will be deemed to have accepted an injury by failing to controvert a claim." *Id.*

[¶25] That decision is inapposite. The issue in the present case is not, as it was in *Carroll*, whether Caribou has an obligation to pay even though it lacked notice that Michaud's petition for benefits resulted from a workplace injury. *Id.* at 24. Caribou unquestionably had notice that Michaud suffered a work-related injury and that the injury may be compensable, as evidenced by the fact that it began voluntarily paying benefits shortly after that. Moreover, we have made clear that "[a]wareness of the compensable nature of the injury . . . [is] required only with respect to triggering the notice and limitations period, and not to set a date of injury." *Jensen v. S.D. Warren Co.*, 2009 ME 35, ¶ 26, 968 A.2d 528; *see also* 39-A M.R.S. § 302 (2024) ("Want of notice is not a bar to proceedings under this Act if it is shown that the employer . . . had knowledge of the injury.").

[¶26] Our distinction between the date on which an employee's entitlement to specific-loss benefits for loss of an eye may be determined and the date on which the benefits became due reflects the Legislature's mandate that the workers' compensation statute be construed neutrally "so as to ensure the efficient delivery of compensation to injured employees at a reasonable cost to employers." 39-A M.R.S. § 153(3). Because eligibility for specific-loss benefits cannot be determined until an employee has undergone reasonable medical treatment, employees will seek care that may restore their vision,

thereby eliminating any likelihood that employers will pay benefits to employees who suffered only temporary vision loss. *See Tracy*, 1998 ME 247, ¶ 12, 720 A.2d 579. At the same time, by compensating employees for the full period that they have suffered vision loss above the statutory threshold, this rule recognizes the "human factors . . . attendant with the traumatic loss of a body part or vision resulting from a work-related injury," *id.* ¶ 7 (quotation marks omitted); *see also* 39-A M.R.S. § 221 (2024), and the minimal costs to the workers' compensation system imposed by these injuries, *see* Richard B. Dalbeck et al., *Report of Blue Ribbon Commission to Examine Alternatives to the Workers' Compensation System and to Make Recommendations Concerning Replacement of the Present System* (Aug. 31, 1992), https://lldc.mainelegislature.org/Open/Rpts/kf3615_z99m243_1992_v1.pdf [https://perma.cc/VRS8-C9K4] (noting that scheduled impairment benefits, from which specific-loss benefits derive, are available for injuries that make up only a "small percentage" of workers' compensation claims). Similarly, although employers will be required to pay interest on specific-loss benefits for traumatic eye injuries dating as far back as the date of injury, that requirement is consistent with the purposes of interest on workers' compensation awards

to compensate the employee for delay in payment and to discourage employers from contesting valid claims. *Guiggey*, 1997 ME 232, ¶ 7, 704 A.2d 375.

[¶27] The Appellate Division affirmed a decree that is inconsistent with the plain language of the Workers' Compensation Act and legislative intent. Based on a misconception of our precedent, it used an arbitrary date to calculate the interest owed on Michaud's specific-loss benefits. *See Bailey*, 2017 ME 160, ¶ 9, 168 A.3d 762. We therefore vacate its decision. Under the facts stipulated to by the parties, Michaud's award became due on the date of his injury, and Caribou owes interest on the award accruing from that date.[7]

The entry is:

> Judgment vacated. Remanded to the Appellate Division with instructions to remand to the ALJ for proceedings consistent with this opinion.

---

Norman G. Trask, Esq. (orally), Currier, Trask & Dunleavy, Presque Isle, for appellant Steve L. Michaud

John J. Cronan III, Esq. (orally), Preti, Flaherty, Beliveau & Pachios, LLP, Portland, for appellees Caribou Ford Mercury, Inc., and the Maine Automobile Dealers' Association Workers' Compensation Trust

Workers Compensation Board Appellate Division case number 23-0003
FOR CLERK REFERENCE ONLY

---

[7] Considering our holding and Michaud's agreement during mediation to an offset from his specific-loss benefit, Caribou was entitled to credit the voluntary incapacity benefits it paid to Michaud between the date of his injury and September 8, 2019. *See Boehm v. Am. Falcon Corp.*, 1999 ME 16, ¶ 11, 726 A.2d 692.